[Civ. No. 5887. Third Appellate District.—May 18, 1938.]

JEFFERSON W. ASHER, Respondent, v. CHARLES G. JOHNSON, State Treasurer, et al., Appellants.

[Civ. No. 5888. Third Appellate District.—May 18, 1938.]

PLAZA AMUSEMENT COMPANY (a Corporation), Respondent, v. CHARLES G. JOHNSON, State Treasurer, et al., Appellants.

[Civ. No. 5889. Third Appellate District.—May 18, 1938.]

OCEAN PARK PIER AMUSEMENT CORPORATION (a Corporation), Respondent, v. CHARLES G. JOHNSON, State Treasurer, et al., Appellants.

[Civ. No. 5890. Third Appellate District.—May 18, 1938.]

CLAUDE L. LANGLEY et al., Respondents, v. CHARLES G. JOHNSON, State Treasurer, et al., Appellants.

[Civ. No. 5891. Third Appellate District.—May 18, 1938.]

FIRST NATIONAL AMUSEMENT COMPANY (a Corporation), Respondent, v. CHARLES G. JOHNSON, State Treasurer, et al., Appellants.

[Civ. No. 5892.   Third Appellate District.—May 18, 1938.]

COAST AMUSEMENT COMPANY (a Corporation), Respondent, v. CHARLES G. JOHNSON, State Treasurer, et al., Appellants.

[Civ. No. 5893.   Third Appellate District.—May 18, 1938.]

OCEAN PARK PIER AMUSEMENT CORPORATION (a Corporation), Respondent, v. CHARLES G. JOHNSON, State Treasurer, et al., Appellants.

[Civ. No. 5894.   Third Appellate District.—May 18, 1938.]

PLAZA AMUSEMENT COMPANY (a Corporation), Respondent, v. CHARLES G. JOHNSON, State Treasurer, et al., Appellants.

U. S. Webb, Attorney-General, and H. H. Linney and James J. Arditto, Deputies Attorney-General, for Appellants.

Andrew J. Copp, Jr., for Respondents.

THOMPSON, J.—The defendants have appealed in eight cases which were consolidated for the purpose of trial. These actions were brought to recover sales taxes paid under protest by the respondents or to obtain the cancellation of bonds given to secure the payment of such taxes. The taxes were collected and the bonds required, in good faith, by the agents of the state board of equalization, pursuant to the provisions of the California Retail Sales Tax Act. (Stats. 1933, p. 2599, Deering's Gen. Supp. Laws, 1933, p. 2360, Act 8493.)

The trial court found that the gross receipts of the enterprises from which the taxes were collected and the bonds required were not derived from sales of tangible personal property, but, upon the contrary, that they represent the income from the operation of gambling devices, prohibited by law, and that the state therefore wrongfully collected and retains the taxes and bonds.

The attorney-general contends that since the transactions involve funds illegally derived from the operation of gambling devices contrary to the provisions of section 330 of the Penal Code, courts of justice will not lend their aid to recover such illegal funds; that the respondents have no title to such funds which courts will recognize or respect.

On the theory that the violations of the criminal law, by means of which the funds acquired by the respondents were derived in transactions completed before the taxes were de-

manded and distinct from the collection thereof and of the furnishing of the bonds, the trial court held that the rule which prompts courts to refrain from lending their aid to illegal transactions has no application. Judgment in each of the eight cases was accordingly rendered in favor of the plaintiff. From those judgments the state has appealed.

The sole question to be determined on these appeals is whether the collection of sales taxes and the requirement to furnish the bonds to secure such payments are so disconnected and separate from the operating of the illegal gambling devices from which the funds were derived that the salutary principle in the interest of public money which precludes courts from lending their aid has no application under the circumstances of these cases. There is little or no controversy regarding the law applicable to that principle. The only difficulty arises in applying the law to the facts of these cases.

In 1933 the plaintiffs were engaged in operating at Santa Monica and Ventura illegal enterprises by means of devices variously called ''Tango'', ''Monaco'', ''Ritz'', ''Plaza B'', ''Plaza 7'', ''Bonanza'', ''Horse Racer'', ''Wheel'O'' and ''Skill Ball''. Their places of business were commonly called ''Amusement Halls'' or ''Palaces of Skill''. All of these devices were operated similar to the game of tango, which is a game of pure chance prohibited by section 330 of the Penal Code. (*Schur* v. *Johnson*, 2 Cal. App. (2d) 680 [38 Pac. (2d) 844].) For convenience we will refer to the enterprises as ''Tango games''. In connection with these games the owners carried stocks of merchandise in the form of cigarettes and tobacco. The customers or participants in the games paid the operator from ten to twenty-five cents for the privilege of playing, in consideration for which they received cards containing a series of numbers and also five balls to be used therein. The tango table contains 75 apertures which are irregularly numbered from 1 to 75. If the patron succeeds in lodging five balls in holes corresponding to the numbers of five separate figures appearing on the card in a straight line, he is deemed to have won the game, and is then paid by the proprietor with merchandise from the shelves in the place of business, consisting of cigarettes or tobacco. If the player fails to secure the necessary numbers, he receives no merchandise and his contribution is then forfeited. The merchandise

is usually redeemed by the payment of its equivalent in cash. The use of the merchandise is a subterfuge to avoid liability for violating the law. It becomes a mere "representative of value" substituted to cover the losses sustained by the owners of the gambling devices. It is claimed one's success in playing these tango games depends largely on skill. We think not. ■ At least the trial court found that they were illegal games of chance. There is ample evidence to support that finding, and we are therefore bound by it.

With respect to the question as to whether these enterprises constitute the selling of merchandise in the form of cigarettes and tobacco, which are tangible personal property, in contemplation of the definition of the term "sales" as it is found in section 2 of the California Retail Sales Tax Act, the proprietors appear to have been quite inconsistent. Evidently, to avoid the liability under section 330 of the Penal Code, for operating a "banking or percentage game" played for "money, checks, credit or other representative of value", they assert, by carrying a stock of merchandise and paying the losses of the games in that manner, that they are engaged in the business of selling personal property. When the state board of equalization demands that they shall procure permits to retail tangible personal property and pay to the state $2\frac{1}{2}$ per cent of the gross income from such sales they claim they are not engaged in selling personal property but, on the contrary, that they are only conducting games of skill for the purpose of amusement. It may be a serious question as to whether bartering or disposing of personal property by paying the losses of tango games therewith, constitutes sales of merchandise in contemplation of the Retail Sales Tax Act. Section 2 of that act defines the term "sales" as follows:

" 'Sale' means any transfer, exchange or barter, conditional or otherwise, *in any manner or by any means whatsoever*, of tangible personal property, for a consideration."

■ It is not necessary for us to determine whether the transactions involved in these cases constitute sales of personal property. We specifically refrain from so doing. The trial court found in accordance with a stipulation:

"That in the conduct of said business plaintiff was not, during said period, and is not now, and never has been, engaged in the business of selling tangible personal property at retail or otherwise."

After the plaintiffs adduced 150 pages of evidence attempting to prove they were not engaged in selling personal property, counsel for the defendants said:

"To save the time of the court, we will stipulate for the purpose of these actions there were not any sales of tangible personal property."

A stipulation of counsel in the course of a trial, with relation to a valid issue in the case, may be accepted as foundation for a finding of fact. Whether a stipulation in open court becomes binding and controlling depends on the circumstances under which it is made. In the present cases we do not question the binding effect of the stipulation with respect to that issue. ▪ The respondents, however, contend that this stipulation and the finding of the court in that regard are absolutely determinative of these appeals. We think not. Conceding for the purpose of these appeals that the respondents were not engaged in retailing tangible personal property, and that the board of equalization, therefore, was not authorized to collect the taxes or enforce the giving of bonds, still we have the problem of determining whether the operation of those illegal devices were so separate and disconnected from the collecting, in good faith, of taxes by the state authorities, based on the gross income from the tango games, that a court of justice will refrain from lending its aid to restore to the owners thereof their ill-gotten gains. We cannot afford to temporize on principles which vitally affect the public welfare.

In the belief that respondents' method of disposing of merchandise in the form of cigarettes and tobacco, to pay to patrons of the games their winnings, constituted sales of tangible personal property within the meaning of the California Retail Sales Tax Act, the agents of the board of equalization demanded payment of taxes in the midst of the quarterly term during which they became due, equivalent in amounts to 2½ per cent of the gross receipts therefrom. These demands were made, in most instances, September 21, 1933, for taxes due on incomes received from August 1st to September 14th of the same year. The taxes demanded, for the period of a month and a half in most cases, ranged from $93 to $2,009. These proceeds received in so brief a period of time indicate that they were not derived from the legitimate sales of cigarettes and tobacco, but that they represent

the profits from gambling devices. The Ocean Park Pier Company paid $2,009 taxes on the proceeds of its tango games in the period of 45 days. That represents $2\frac{1}{2}$ per cent of its proceeds during a brief period of time. The company, therefore, derived $80,360 from its tango games in a month and a half. This indicates the extent to which the spirit of gambling prevails, and the serious result of encouraging its continuance.

In determining whether a court will direct the return of money collected under the circumstances of these cases, it becomes important to decide whether it was necessary for the respondents to disclose the illegal nature of their enterprises to prove that they were not engaged in selling personal property. Under the pleadings in these cases it was necessary for the respondents to prove the nature of the transactions from which they derived the funds which the state sought to tax. In the several complaints it is alleged:

"None of his gross receipts in the transaction of his business are or ever have been received from the sale by him, either as principal or agent, of tangible personal property."

The preceding allegations were specifically denied by the defendants in each case. The essential issue, therefore, became the nature of the business from which the taxed proceeds were derived. The burden was on the plaintiffs to show they were not engaged in selling personal property. One hundred and fifty pages of transcript were consumed in recording plaintiffs' proof upon that issue, after which, to save the time of the court and because they thought it was not essential to the determination of the cases, the attorneys for defendants made the stipulation above quoted. In their effort to prove they were not selling personal property, the plaintiffs conclusively established the fact that their proceeds were derived from gambling devices operated contrary to the provisions of section 330 of the Penal Code. The trial court so found. That is an established fact in these cases. Thereupon the question immediately arose as to whether the owners of the illegal enterprises possessed such right or title to the portion thereof held by the state as sales taxes, as would entitle them to restitution thereof, and whether the nature of the transactions precludes the court from lending its aid to restore the property.

In the late opinion of the Supreme Court in *People* v. *Rosen,* 11 Cal. (2d) 147 [78 Pac. (2d) 727], involving the proceeds derived from a tango game, it is said:

"It is the law in this state that certain games of chance, such as lotteries, are illegal; that the winner gains no title to the property at stake nor any right to possession thereof; and that the participants have no standing in a court of law or equity. (*Gridley* v. *Dorn,* 57 Cal. 78 [40 Am. Rep. 110]; *Bank of Orland* v. *Harlan,* 188 Cal. 413, 421 [206 Pac. 75]; 16 Cal. Jur., p. 716.)"

In the case of *Dorrell* v. *Clark,* 90 Mont. 585 [4 Pac. (2d) 712, 79 A. L. R. 1000], a judgment refusing to restore to the plaintiff money found in a slot machine which was seized by the sheriff was affirmed. The law did not authorize the seizing of money in a gambling device. The sheriff arbitrarily took it and turned it over to the clerk. On appeal it was determined the owner of the machine had no title to gambling funds which a court would respect; that a party to an illegal enterprise could not come into a court of law to ask that its illegal project be carried out. The court said:

"In seeking to recover the money, plaintiff brought his suit in conversion, alleging that the sheriff, without right or authority, seized and carried away and detains property to the 'immediate possession' of which plaintiff was entitled. In such an action plaintiff must recover, if at all, upon the strength of his own title and not upon the weakness of his adversary. . . .

"All of these facts [the maintenance of the illegal slot machine containing the money] were necessarily disclosed to the court by the plaintiff in attempting to make a *prima facie* case. Thus the plaintiff, admitting the violation of the law, asked the aid of the very court charged with the duty of punishing that violation, and which had performed that duty, in securing the fruits of his outlawry, which he admitted he would not be entitled to retain under the law, had he reduced the same to possession. 'No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out; nor can he set up a case in which he must necessarily disclose an illegal purpose as the groundwork of his claim.' (13 C. J. 492.) . . .

"Plaintiff asserts that the general rule is that illegality cannot be set up by a third person, but is only available to a party to a contract (13 C. J. 508); but he fails to note that the text reads: 'This rule is of course subject to an exception, where it is attempted to assert rights based on the contract.' Strictly speaking, there is no contract here involved; plaintiff merely seeks the aid of the court to reduce to possession the spoils of the law's violation.

" . . . Whatever may or may not be done with the money in the custody of the court, the power of our courts, either at law or in equity, cannôt be invoked in aid of one showing a violation of the law, to complete the illegal transaction and secure to the violator the fruits of his outlawry."

The respondents contend the acts of gambling in the present cases from which the particular receipts in question were derived were completed before the state demanded the payment of taxes thereon, or the furnishing of bonds to secure such taxes, and, moreover, that the gambling transactions were separate and distinct from the collection of taxes on the proceeds therefrom, and, the principle of refraining from determining a suit involving illegal transactions does not apply, and that the court, therefore, properly directed the return of the property.

We feel convinced from the evidence that the transactions of operating the tango games under the circumstances of these cases are not so disconnected with the collection of the taxes or the furnishing of bonds that a court may lend its aid to enforce the return of such ill-gotten gains. On the contrary, we are of the opinion the collection of the taxes and the procuring of the bonds are so directly associated and intermingled that the principle of refusing to become the instrument of deciding litigation necessarily based on such illegal transactions does apply, and that the trial court, therefore, erroneously rendered judgments in favor of the plaintiffs in these cases.

In support of our conclusions that neither the completion of the tango games prior to the demand for taxes, nor the distinction between the operation of the games and the collection of taxes furnish reasons for waiving the principle of refusing to interfere, we suggest the following facts: The gambling games in question are continuing violations of the criminal law. It may not be reasonably said the game terminates

when an unlucky victim plays five balls and loses. It is evident from the large receipts that the games continue. A favorable decision in these cases will encourage them to continue. The taxes which were paid were collected in the middle of the quarterly period fixed by the statute for them to become due. They were founded on the receipts from gambling games. They were paid by the plaintiffs as a condition upon which they would be permitted to continue to operate their games. The complaints alleged that the board threatened to close their businesses if they refused or failed to pay the taxes or to secure them by giving bonds, and that under that "duress and compulsion" they paid the taxes under protest and furnished the bonds. The payment of these taxes, therefore, conferred permissive authority to continue to maintain the games. We do not infer the authorities intentionally licensed the operation of gambling devices. They assumed, and undoubtedly honestly believed, the enterprises constituted the maintenance of businesses in retailing tangible personal property within the meaning of the Retail Sales Tax Act. It is fundamental that an unlawful business may be taxed by governmental agencies. (*United States* v. *Sullivan,* 274 U. S. 259 [47 Sup. Ct. 607, 71 L. Ed. 1037, 51 A. L. R. 1020]; *Salt Lake City* v. *Hollister,* 118 U. S. 256 [6 Sup. Ct. 1055, 30 L. Ed. 176].) The Sales Tax Act specifically provides for a privilege tax as distinguished from a mere property tax. In the case of *Roth Drug, Inc.,* v. *Johnson,* 13 Cal. App. (2d) 720, 730 [57 Pac. (2d) 1022], it is said in that regard:

"The retail sales tax, which requires the payment of a specified percentage of the gross receipts from the sales of merchandise, *as a privilege of conducting the business of selling tangible personal property,* is an 'excise' or 'privilege tax', as distinguished from a personal property tax. (2 Cooley on Taxation (3d ed.), p. 1094; 2 Cooley's Constitutional Limitations (8th ed.), p. 988; 61 C. J., p. 242, secs. 227, 228; *Vancouver Oil Co.* v. *Henneford,* 183 Wash. 317 [49 Pac. (2d) 14]; *Morrow* v. *Henneford,* 182 Wash. 625 [47 Pac. (2d) 1016].)"

This California Retail Sales Tax Act provides that it shall be unlawful for any person to engage in retailing personal property within the state without first procuring a permit therefor. The act provides a nominal fee of $1 for this permit. Any person who violates the act is guilty of a misdemeanor. Section 9 of the act provides that the tax shall become a direct

obligation on the person who retails personal property, payable in quarterly instalments on or before the 15th day of the month next succeeding each quarter during which the goods are sold. At the option of the board of equalization, the taxes may be required to be paid at any time. Section 11 of the act authorizes the board to enforce the giving of bonds to secure the payment of taxes. The act makes it the duty of the board to require the payment of such taxes at the times and in the manner directed.

Pursuant to the terms of that act the agents of the board ascertained the gross proceeds of the various enterprises of the plaintiffs from August 1 to September 14, 1933, and promptly demanded payment of sales taxes thereon at the rate of 2½ per cent thereof, threatening to close the businesses if the taxes were not promptly paid or secured by the furnishing of bonds. Some of the plaintiffs paid the taxes under protest. Others gave their bonds to secure the claimed taxes. The defendants actually received a portion of the illegal funds derived from the tango games, in amount of 2½ per cent of the gross receipts thereof. The payment or securing of those taxes resulted in the plaintiffs continuing to operate their tango games. Under such circumstances it clearly may not be said that because the plaintiffs had already pocketed the proceeds derived from 45 days' operation of illegal devices, and that the state under the provisions of the Retail Sales Tax Act thereafter enforced the payment or security of 2½ per cent thereof, that the particular games from which the funds were derived were completed, or the transactions so distinct from the collection of taxes thereon, that a court should direct the restoration of such ill-gotten gains.

It does not matter that the agents of the state were not parties to the maintaining of the illegal games. The plaintiffs were the culpable parties. They now seek to recover a part of their funds obtained from gambling devices. They acquired their respective funds from illegal gambling. Part of those funds were seized by the state as sales taxes. The plaintiffs were unable to prove that the state wrongfully took a portion of their gambling proceeds until they conclusively established the illegal nature of their games. These cases appear to us to be eminently proper ones in which to enforce the wholesome rule to refuse to lend the aid of the court to

restore property acquired and claimed as the proceeds of illegal gaming.

Many authorities are cited with respect to the rules of law applicable to *contracts* based on illegal transactions. These cases may throw light on the question involved in the present actions, but, as the court said in the Dorrell case, *supra,* "there is no contract here involved". The principle which is invoked in these cases is the question as to whether a court will refuse, on the ground of public policy, to restore money derived from gambling at the suit of the culpable party, on the theory that it may tend to encourage the maintenance of unlawful games to the detriment of public morals and welfare. There is a clear distinction between those cases dependent on the principles affecting contracts, and the salutary rule invoked to uphold law and order.

The respondents quote from 6 California Jurisprudence, page 160, section 111, as follows:

"Even though parties have been engaged in an illegal transaction, yet if the cause of action between them is disconnected from the illegal act and is founded upon a distinct and collateral consideration, and the plaintiff is not obliged to resort to the illegal contract in order to maintain the suit, the illegality of the former transaction will not impair or bar the right to maintain the suit. If the contract does not depend upon or require the enforcement of the unexecuted provisions of the illegal contract, it will be carried out. Therefore the test is declared to be whether the contract sought to be enforced can be separated from the illegal acts or contracts relied upon as avoiding it, and whether the plaintiff requires any aid from, or must in any way rely upon the illegal transaction in order to establish his case."

There is no doubt regarding the soundness of that declaration of law. For instance, if a gambler paid a tax collector improvement taxes on real property under protest with money previously acquired by means of illegal gambling, and he sought to recover the money on the ground that it was paid through coercion and force, the tax collector could not successfully defend that action on the ground that the money was derived from gambling, because there is no connection between the demand for taxes and the source from which the money was derived. But the facts of the present cases are vitally different from the circumstances of that illustration. In these cases the sales taxes sought to be recovered were

procured by levying 2½ per cent of the very receipts of the illegal games. The maintenance of the games and the levying of taxes in these cases are directly connected. Moreover, the taxes were permissive in their nature. By the payment of the taxes the games were permitted to continue. The gambling enterprises and the collection of taxes were inseparably united. The plaintiffs were forced to disclose their illegal operation of the tango games in their attempt to prove they were not engaged in retailing tangible personal property. The facts of these cases, therefore, come directly within the foregoing text relied on by the respondents. That text precludes the operator of a gambling device under the circumstances of these cases from recovering the proceeds of such illegal games.

The rule is well established without conflict of authorities that when a plaintiff, who is the culpable party, is compelled to disclose the fact that the transaction upon which he relies for recovery is an illegal violation of criminal law, the courts will invariably refuse to determine the controversy, and will leave the offender against the law exactly where he finds himself at the outset of the litigation. Where public morals are directly or indirectly concerned, courts will not critically examine the details of a transaction to determine that the source of funds is technically disconnected with the procuring of a share thereof so as to restore the proceeds of gambling games and encourage the continued violation of law.

Often it is difficult to determine whether an illegal contract or transaction is so connected with the subject of litigation as to warrant a court in refusing its aid. In 12 American Jurisprudence, page 646, section 152, it is said in that regard:

"A contract is invalid if it is so connected with an illegal purpose as to be inseparable from it. It is impossible, it has been said, to lay down any exact rule by which it may always be determined whether an agreement is collateral to, and so disconnected from, an illegal and immoral business as to make it enforceable, when it would not be enforceable if it were directly in aid of, or in the advancement or encouragement of, acts in violation of the law or if it were in furtherance of an illegal agreement. . . . If a connection between the original illegal transaction and a new promise can be traced, no matter how many times and in how many different forms it may be renewed, it cannot form the basis of a recovery."

It is held that one who participates in the benefits derived from an illegal contract or enterprise is deemed to have had knowledge thereof. It is said in 12 American Jurisprudence, page 650, section 156:

"The difference of opinion as to whether a contract is invalidated by the mere knowledge of one of the parties of the other's unlawful intention does not extend to participation in such intention. Even courts which entertain the view that mere knowledge is insufficient agree that participation in the unlawful intention renders the contract illegal. There would seem to be no doubt that one may be deemed to be a participant in the other's unlawful design if he shares in the benefits of the violation of law."

In the case of *Smith* v. *California Thorn Cordage, Inc.*, 129 Cal. App. 93, 99 [18 Pac. (2d) 393], the general rule applicable to the court's attitude toward transactions involving illegal contracts or games, is announced as follows:

"No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and set up a case in which he must necesarily disclose an illegal contract as the groundwork of his claim."

In *Berka* v. *Woodward*, 125 Cal. 119, at page 127 [57 Pac. 777, 73 Am. St. Rep. 31, 45 L. R. A. 420], the same rule is expressed in the following language:

" 'The principle to be extracted from all the cases is that the law will not lend its support to a claim founded on its own violation.' And in our own state it has been said (*Swanger* v. *Mayberry*, 59 Cal. 91): 'The general principle is well established that a contract founded on an illegal consideration, or which is made for the purpose of furthering any matter or thing prohibited by statute, or to aid or assist any party therein, is void.' . . . 'The test,' says Judge Duncan in *Swan* v. *Scott*, 11 Serg. & R. (Pa.) 164, 'whether a demand connected with an illegal transaction is capable of being enforced at law, is whether the plaintiff requires the aid of the illegal transaction to establish his case. If the plaintiff cannot open his case without showing that he has broken the law, the court will not assist him, whatever his claim in justice may be upon the defendant.' "

In *Butler* v. *Agnew*, 9 Cal. App. 327, 332 [99 Pac. 395], the same principle is likewise announced. It is there said:

"The test whether a demand which is connected with an illegal transaction may be enforced at law is, Does the plain-

tiff require the aid of the illegal transaction to establish his case? If the plaintiff cannot prove his case without showing that he has broken the law, the court will not assist him, whatever the justice of his claim against the defendant. . . . The right of plaintiff to a division of the profits and proceeds, . . . can be established only by the introduction in evidence of the entire contract. The whole texture of it is so interwoven, each part with the other, that it is inseparable. To hold the transaction severable, as contended for by the appellant, would be to separate the shadow from the substance and apply the rule to the shadow while the violator enjoyed the benefit of the substance of his illegal contract.''

In the case of *Schur* v. *Johnson*, 2 Cal. App. (2d) 680 [38 Pac. (2d) 844], we passed directly on the very issue which is here presented, adversely to the respondents. It is insisted that what was there said regarding the policy of courts to refrain from determining controversies founded on illegal transactions, is *dictum*. We think not. The illegal nature of the tango game was directly involved on that appeal.

The numerous cases which are cited by the respondents are not in conflict with what we have previously said regarding the principle of refusing to extend the aid of courts to transactions founded on illegal transactions. A detailed discussion of those cases will serve no useful purpose.

For the reasons that the evidence which was adduced at the trial of these cases necessarily disclosed the fact that the funds upon which the levies of taxes were imposed were derived from illegal games of chance, and that the operation of the tango games by the respondents was not disconnected with the collection of taxes and the furnishing of bonds, we are of the opinion the trial court erroneously rendered judgments in favor of the respondents.

The judgments are reversed, and the court is directed to render judgments against the plaintiffs to the effect that they take nothing by their actions.

Pullen, P. J., and Plummer, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 15, 1938.