FOX, J.
The defendant Del Mar Corporation was conducting a game .known as Bingo in a room on the fourth floor of a building in the city of Santa Monica. It was stipulated that the game as played constituted a lottery under the law of this state. The property to be thus distributed was War Savings Stamps and money.
It was also stipulated that the room where the game was being played was equipped with chairs, tables, wheels, counter, cards, and discs, sufficient in number to accommodate 96 players ; that during the progress of the game some of the players were seated on chairs at a long rectangular counter and others were seated at small tables on the outer edge of the room; that an electrically operated wheel was located near the wall of one end of the room; that said wheel was approximately 6 feet in diameter; that on the face of the wheel around its outer circumference arranged promiscuously and not consecutively appeared the numbers from 1 to 75, inclusive; that certain cards, which had upon their face 24 numerals selected promiscuously from among the numerals 1 to 75, inclusive, arranged in five rows of five numerals each, except that the middle space in the middle row was left blank, were provided for the players upon their paying the required consideration; and that the play of the game proceeded by an operator (employed by defendant) starting the wheel revolving, which continued spinning until it came to rest at random, then indicating by an electric light one of the numerals upon the face of the wheel. It also appeared that there was a loud speaker in the corner of the room and a microphone near the control board, and an indicator board at one end of the room, about 4 feet by 20 feet, where the number on which the wheel stopped would be shown. This room was about 40 feet by 60 feet. The game was operated by three employees of defendant. One employee operated the wheel and the other two collected the money from the players and distributed the prizes. It further appears that the game was in progress night after night, as well as at least during some of the afternoons, and for periods of several consecutive hours. The management always provided the operators with about $500 in War Savings Stamps and $100 in money. It took only seven or eight minutes to go through the necessary routine to-determine who was entitled to a particular prize. The prizes varied from $2.00 to *Supp. 856 $10.00 according to the number of players participating in the game. They were paid in War Savings Stamps, or when a prize was split between several persons in such manner that the denominations of stamps on hand would not equal each person’s share, money was paid for the difference.
During the progress of the game deputies from the sheriff’s office seized the stamps and money which had been provided by the defendant corporation for carrying on the game and which were then in the possession of the employees who were operating it. This action was then brought in the name of the People under section 325, Penal Code, to have said stamps and money forfeited to the state. The material part of this Penal Code section reads as follows: “All moneys and property offered for sale or distribution in violation of any of the provisions of this chapter are forfeited to the state, ...” (Italics added.) The code sections which make Bingo a lottery are in the same chapter of the Penal Code as section 325. The trial court rendered judgment for the defendant corporation. The plaintiff has appealed.
Counsel for defendant corporation argue that only the stamps and money which made up the particular prize that was being played for at the moment the seizure by the officers took place were forfeited; that the other stamps and money there in the room in the possession of the operators of the game were not subject to forfeiture. This latter conclusion is based on the theory that such stamps and money were not “offered for . . . distribution.” This theory and the conclusion based thereon are not sound.
In Asher v. Johnson (1938), 26 Cal.App.2d 403 [79 P.2d 457] the court, in'discussing tango (which in purpose, though not in technique, appears to be at least a first cousin of Bingó) observed (pp. 411-12) that “It may not be reasonably said the game terminates when an unlucky victim plays five balls and loses. It is evident from the large receipts that the games continue.” (Italics added.) In like manner it is evident from the spaciousness of defendant’s quarters, the elaborateness with which they are equipped, the mechanical and electrical devices provided, the number of employees, the amount of money and War Savings Stamps provided for each session of play, the length and regularity of the sessions—in fact, from defendant’s entire setup—that the game does not ter *Supp. 857 mínate when the winner of a particular prize has been determined.
If, however, it may be said that the determination of the player entitled to a particular prize constitutes a game, it is obvious that all the elaborate and expensive setup was not gotten together for the purpose of playing just a single game. It of course contemplates a repetition of the routine so long as the place stays open and there are sufficient participating patrons, and a resumption of it when the place reopens the next afternoon or evening, and so on ad infinitum. It represents a business enterprise just as much as a grocery store does. The equipment here corresponds to the counters, showcases, scales, etc., of the grocery store. The War Savings Stamps and money constitute the stock-in-trade just as the cans on the grocer’s shelves constitute part of his stock-in-trade. Each can of merchandise is being offered for sale by the grocer even while it is still on his shelves. The goods are offered for sale without an overt act or solicitation on his part. (State v. Dunbar (1886), 13 Ore. 591 [11 P. 298, 57 Am.Rep. 33; People v. Lewis (1910), 138 App.Div. 673 [122 N.Y.S. 1025].) Likewise here the stamps and money in the gaming room were being offered for distribution as prizes. True, they might not all be thus' distributed because there might not be enough patrons playing long enough to accomplish this result. But the stamps and money were nevertheless offered for distribution just as much as the unsold cans have been offered for sale during the day when the grocer closes his store at night.
The employees of defendant corporation thoroughly understood that at least the War Savings Stamps were a part of their stock-in-trade for distribution. Jeanne Chevalier (one of such employees) testified on cross-examination as follows: “Q. These stamps that you brought up there were to be used by you in paying off winners of these games ? ” “A. That’s right, yes.”
”Q. You brought them [the War Savings Stamps] up there for the purpose of distributing them to winners?
“A. That’s right, yes, I did.
‘ ‘ Q. Of this Bingo game, did you not ?
“A. Yes.”
It is suggested that under such an interpretation of the code section (Pen. Code, § 325) the money downstairs in defendant’s safe would be subject to seizure and forfeiture. *Supp. 858 This of course is not true. Such funds would not have been appropriated to the game and, not being at the place where the game was being played, would not be a part of the stock-in-trade and consequently would not be offered for distribution as prizes. Such funds would be like the crates of canned goods the grocer still has in the warehouse. They have not yet become a part of his stock and so are not being offered for sale.
To hold that only the stamps and money that are to be given as a prize at the conclusion of one of these seven or eight-minute routine operations is all that is being offered is to ignore the physical setup and the practical operation of this game.
The judgment and order denying a motion for a new trial are reversed and the case is remanded for a new trial, appellant to recover its costs on appeal.
Shaw, P. J., concurred.