[Civ. No. 2168. Fourth Appellate District.—February 7, 1939.]

ADELE FRANKISH, Respondent, v. FEDERAL MORT-GAGE COMPANY (a Corporation) et al., Defendants; . INTERMOUNTAIN TITLE GUARANTEE COMPANY (a Corporation) et al., Appellants.

Burr & Smith, Philip Grey Smith, A. M. Cross and S. J. Loughlin for Appellants.

Edward E. Gray for Respondent.

GRIFFIN, J.—This is an action to cancel a trust deed and note. Respondent, a widow, was the owner of certain real property, subject to a mortgage of $1535.29, located in the city of Ontario, San Bernardino County. Parcel 1 was an unimproved city block. Parcel 2 consisted of a lot which was improved with a store building and under lease by paying tenants at a monthly rental of $100. Both parcels were valuable properties. It appeared that respondent was willing to sell these properties to avoid the cares of rental, upkeep, and the like, and to transform the vacant block into securities that would return an income. In San Jose there lived one DeWitt C. Rucker, a real estate and insurance man. His family and Mrs. Frankish's family were close and old time friends. One of respondent's intimate friends was the betrothed of Mr. Rucker.

From the complaint and the testimony it appears that respondent sought out Mr. Rucker to sell her vacant lot for a post-office site. Rucker induced her to turn these properties over to the General Insurance Securities Company (for brevity's sake hereinafter referred to as the GIS), a Nevada

corporation, with headquarters in Los Angeles. The National Title Insurance Company, a corporation, one of the appellants herein, was trustee under the trust deed involved.

Among the many representations made, respondent was told by Rucker that for her properties this corporation would give her $40,000 worth of gold notes, secured by upwards of a million dollars' worth of pledged securities.

The evidence shows that she relied absolutely upon Mr. Rucker, who was acting as her broker. He was to receive from her a 5 per cent commission for the transaction. He also sought a like commission from the GIS.

During this time he was agent for the GIS, and on July 10, 1933, he was elected as one of the directors of the company. On March 4, 1933, he submitted a report to the GIS as a member of their executive committee.

On February 3, 1933, respondent deeded the property to the GIS. On March 23, 1933, she received a naked $40,000 promissory note from it and never received any gold notes secured by pledges of a million dollars or otherwise. In 1932, the GIS commenced negotiations to secure a controlling interest in the Intermountain Title Guarantee Company, a corporation (hereinafter referred to as the Intermountain), one of the appellants herein. Its principal place of business was in Salt Lake City, Utah. From January to June, 1933, the GIS secured from 51 per cent to 93 per cent of the capital stock of the Intermountain. The stock of another corporation, the Federal Mortgage Company (hereinafter called the Federal), was wholly owned by the GIS.

Respondent claimed that these two corporations were but a few of the numerous lesser companies owned or partially owned by the GIS and that the GIS was in fact acting as a "parent or holding company".

After paying off the mortgage of $1535.29, on March 23, 1933, the GIS conveyed the property deeded by Mrs. Frankish to the Federal, which company it wholly owned, with directions to it to issue a promissory note for $20,000, secured by a trust deed on the property to the other company, i. e., the Intermountain, which was done in accordance with the request. Hence, on that date the title to the property was in the Federal, subject to a trust deed of $20,000 held by the Intermountain.

The minute books of the GIS disclose the following entry in reference to the Frankish deal: "That the proposition presented, be accepted, subject to the approval of the Corporation Commissioner." The corporation commissioner's permit allowed it to issue to respondent its series A, first lien collateral gold notes in an amount of not to exceed $60,000, as consideration for the real and personal properties described in its application for the permit. Respondent claims the GIS violated the terms of this permit in taking over the Frankish property and giving her a mere promissory note unsecured by anything.

Within a year or so from the date of the receipt of the deed from Mrs. Frankish, the GIS went into bankruptcy. Prior to this time, however, the GIS was unable, or failed to deliver to her the $40,000 in gold notes. Negotiations were kept in abeyance for some period of time as between the GIS and respondent, due to some claimed agreement whereby it was to return the property to her free and clear of all incumbrances. It allowed her for several months to collect the rents from the property, due to the fact that the GIS had not paid all of the interest on its promissory note to her and because she had no funds of her own. After considerable controversy the Federal, on January 3, 1934, deeded the property, subject to the $20,000 trust deed, to DeWitt C. Rucker, as trustee for Adele Frankish. This was done apparently for the purpose of attempting to perfect some arrangements for the return of the property to respondent in accordance with the negotiations with the GIS. In July, 1935, Rucker, as trustee, conveyed his equity to respondent.

Appellant claims that in addition to the GIS paying off the mortgage on respondent's property, she collected in rent and was paid a sum totaling $1360, in cash, all of which was paid to her prior to November, 1933, excepting the sum of $150, which was collected subsequent to that date. The GIS also charged her with $666.67, as commission due Rucker, and title charges in the sum of $156.

Appellants claim that the findings of the court that plaintiff had been defrauded are not supported by the evidence and are contrary to the evidence and the law. As to this issue, generally speaking, the court found:

"That plaintiff herein had no independent advice, reposed the fullest confidence at all times herein at issue in the said Rucker and believed his representations and statements without reserve and relied and acted thereon, and that he thereby misled and deceived her to her harm; that such representations were made with intent to deceive plaintiff or thereby to induce her to grant and convey her said realty unto GIS. . . . That he concealed from plaintiff the fact that he was a director and officer of GIS, and that he was also acting as sales agent for GIS. . . . That the one or more papers signed in this case in relation to this transaction, other than the deed itself, were not read by plaintiff, nor understood by her, and that she signed the same without reading, upon the definite representations of her said broker that they were for different purposes, and contained different provisions than actually was the case in the writings themselves. That the representations of the said Rucker to her included suggestions as facts or matters which were untrue and which the said Rucker knew were untrue; and included positive assertions by him in a manner not warranted, of things and matters which were not true, even though he believed them to be true, and included other acts and representations by him calculated to deceive her and which did deceive her, by reason of her complete confidence in him, and that thereby plaintiff was misled to her serious injury. That in any view of the case, the statements, assertions and representations of the said Rucker to plaintiff, and his conduct generally in all matters pertaining to the transfer of such real estate constituted constructive fraud on his part, and had all of the actual consequences and legal effects of actual fraud, and that there were both actual and constructive frauds in the entire episode on his part. That the confidential relations between plaintiff and the said Rucker were by him grossly abused to her harm . . . The court finds that while such written contract or offer to sell is signed by plaintiff, she did not sign the same having knowledge of the contents thereof, or understanding of the contents, and that she signed the same under such undue influence and misrepresentations as aforesaid and in the belief that she was to secure highly valuable and safe securities therefor in such Gold Notes, secured by upwards of a million dollars in pledges, and not

706

otherwise . . . The court finds that the officers and directors of GIS had by March 4, 1933, been warned or informed that said corporation and some or all of its subsidiaries were threatened with insolvency.''

It is to be noted in this case that the Federal, although served with summons, did not appear in the action, and its default was subsequently entered. The GIS was not made a party defendant.

We have carefully examined the record at length on the issue of fraud as between respondent and the GIS, the Federal, and their agent, Rucker, and will hereafter quote some of the testimony bearing on this issue. We are firmly convinced that the detailed findings of the trial court on this issue are amply supported by the evidence. Whether the Intermountain had notice of the fraudulent transactions, as found by the trial court, will be considered and discussed later in this opinion.

The court made further findings as to which appellants make the same objections. The court found that respondent exercised reasonable diligence in attempting to rescind promptly under the circumstances. The pertinent portions of those findings may be thus stated:

''17. The court further finds and determines that while plaintiff had accepted such $1,360.00 during the period specified, that she did not thereby intend to ratify and affirm such transaction, nor to affirm, approve or ratify such $40,000 promissory note. That in truth and fact she did not accept or ratify and affirm such transaction, but to the contrary denied the same and ever insisted throughout such period that she should have her property back, free and clear, or else that she be given such Gold Notes secured by ample pledges and that in any event her interests be thoroughly secured against any possible loss . . . That repeatedly during such period the said Rucker assured her that he would get her property back for her, free and clear; that she first learned of the existence of the trust deed in favor of Intermountain along in November, 1933, and that thereafter and prior to February 28, 1934, and after such date, also, the said Rucker promised and agreed that she would get her property back, free and clear. That at no time after February 2, 1933, did plaintiff accept the *status quo* and did not knowingly or in-

tentionally or by her course of conduct ratify and affirm that transaction whereby she received such promissory note for $40,000, but to the contrary still relied upon the assurance given her that she would get her property back free and clear of any and all encumbrances, or that she would be absolutely secured and protected against loss. That during the period from the time she conveyed her property to GIS, until this action was instituted by her, plaintiff had no source of revenue whatsoever, had absolutely no income, and had no means of livelihood, or to support her aged mother who lived with her, her husband being dead, other than the moneys she secured as interest as aforesaid, which ceased February 28, 1934. . . .

"18. The court finds that Intermountain did not pay plaintiff anything at any time, nor did it advance any moneys whatsoever in respect of such real estate. That it suffered no prejudice and that it is and was not entitled to have restored unto it anything or moneys from plaintiff. That it did not change its position, or suffer any hurt or loss whatsoever by reason of any act or omission by plaintiff, in the entire episode. . . .

"19. . . . That at all these times Intermountain was able to protect itself against any possible hurt or loss and was offered or given contributions from GIS much larger than the sum of $20,000. . . .

"23. The court also finds that plaintiff by reason of the assurance and representations made unto her by the said Rucker, and because of her continued confidence in him, was lulled into a sense of security, even after she learned of the trust deed given to Intermountain, and up to the date that GIS had been adjudicated a bankrupt. That Intermountain was not prejudiced or damaged by any delay on plaintiff's part, or by any lack of notice from her. That no harm or prejudice resulted to Intermountain by any omission or act on plaintiff's part. That plaintiff was not made aware of her right or duty to give notice, to offer to restore, or to cancel or rescind, and that in any event plaintiff was still under the influence of said Rucker long after November, 1933, when she first learned of the existence of the Intermountain trust deed. The court finds from the evidence, and concludes from the unusual circumstances of this case, that plaintiff was not

guilty of any laches and that Intermountain did not change its position, nor was it hurt or prejudiced by any act or omission on her part. The court also concludes and finds that any such notice would have been a useless and vain thing. That Intermountain was already charged with all knowledge it might have received from her.''

Appellants strongly maintain that respondent knew every material fact entitling her to rescind and that she may not rightfully delay indefinitely the ascertainment of her rights, and that the delay in the instant case was fatal to a recovery, citing *McCray* v. *Title Ins. & Trust Co.,* 12 Cal. App. (2d) 537 [55 Pac. (2d) 1234] ; *Victor Oil Co.* v. *Drum,* 184 Cal. 226, at 243 [193 Pac. 243] ; *Stevens* v. *Bryson,* 135 Cal. App. 684, 686 [27 Pac. (2d) 932] ; *Oppenheimer* v. *Clunie,* 142 Cal. 313, 320 [75 Pac. 899] ; *Hannah* v. *Steinman,* 159 Cal. 142 [112 Pac. 1094].

█ It is the general rule in courts of equity that a party desiring to rescind, must do so promptly, if he is free from duress, menace, undue influence or disability and is aware of his rights to rescind (Civ. Code, sec. 1691; *Bailey* v. *Fox,* 78 Cal. 389, 396 [20 Pac. 868]), and that if, after discovering the facts, he conducts himself as though the contract were valid and in full force, he waives all right of election to rescind, based on the known facts. (*Evans* v. *Duke,* 140 Cal. 22 [73 Pac. 732].)

Respondent defends this finding of the court on the theory that appellants did not plead laches, but did plead waiver, or that respondent ratified and affirmed the trust deed in question, and cites *Victor Oil Co.* v. *Drum, supra,* wherein it was stated at page 243: ''We might also add that laches is a defense and not a condition of relief, and, if it does not appear on the face of the complaint, must be affirmatively pleaded and proven by the defendants.''

█ Respondent further contends that the instant action is not one for rescission but is a case of cancellation based on fraud. The record discloses that from the time Mrs. Frankish discovered the fraud negotiations continued between her and the GIS or between her and Rucker as a representative of GIS for the return of the property to her free and clear of incumbrances and that the whole matter was left open for their action until appellant attempted to foreclose the trust

deed. Then this suit was instituted. At no time did GIS or anyone else repudiate the transaction or refuse to continue the negotiations with her or to hand her back the property clear of the incumbrance.

The detailed facts related in the findings are adequately supported by the evidence.

In the recent case of *Potter* v. *Contra Costa Realty Co.*, 220 Cal. 31 [29 Pac. (2d) 189], our Supreme Court has clearly defined the rule applicable to the facts disclosed in the instant case and clearly distinguishes the effect of the cases above cited. In that case Mrs. Potter made a contract to buy a lot on February 11, 1916, agreeing to pay $1,000 for it. On December 12, 1921, she completed her payments and demanded a deed. Some controversy arose about water mains, construction of sidewalks, etc. In November, 1929, nearly eight years after the full payment of the purchase price, the negotiations finally terminated, notice of rescission was given, and the money paid in was demanded. The lower court held that she was guilty of laches which barred her right to rescind. In reversing the judgment that court stated:

"The judgment is sought to be justified upon the equitable principle of laches, but it derives no support from that doctrine."

The court further recites: "that defendant in the course of the negotiations promised to fulfill its obligations, and did not, until 1929, in any way repudiate the same. That she had a right to rescind for failure of consideration is clear, and she did not lose that right by her indulgence of defendant in reliance upon its promise to perform. . . .

"The doctrine of laches bars equitable relief where the party seeking relief has been guilty of excessive, unjustified delay in asserting rights, but delay is justified where it results from negotiations to reach a settlement of the controversy, and this must be particularly true where the defaulting party represents that he will make good his default."

We quote a few excerpts from the testimony given in support of this point. Referring to Mr. Rucker, Mrs. Frankish stated:

"I said to him at the time 'Do you know that is the only income that I have and that I am supporting my mother?'

. . . I said 'DeWitt, I cannot afford to lose that property.' He said 'I thoroughly understand that; I appreciate that.' They all knew my circumstances; I had nothing but that. The wife that was to be and the mother-in-law, I had known them for years, and he said 'this is a sound good proposition. I have thoroughly investigated it.' He said 'so much so that we are all—my family is willing to go into it, and which is more' he said 'I am to be made a Vice President of this Company.' He told me that to encourage me. He said 'By that, Adele, you cannot lose that property; I would see that you didn't.' . . . Q. Did you have any independent advice in this matter at all? A. None whatever. I relied completely on Rucker. . . . He says 'I have thoroughly investigated and I am in a position to investigate it better than you.' He says 'Don't you trust me?' He (Rucker) said, 'I have thoroughly investigated.' I said 'How about me seeing a lawyer.' He said: 'Don't you trust me? I can be as good as a lawyer to you; I am your broker; I know as much as any of them; I would not do this deal only as a broker,' so of course, I left it at that, and a broker is supposed to make a clean deal for a person. . . . A. All through that I said to him—I cautioned him every time I met Mr. Rucker, I kept hammering and hammering and harping on that subject that it was the only income I had, and that I could not lose it. I says 'DeWitt, I want you to promise me'—he said that being a Vice President he could see that I never lost that and I said to him time and time again 'I want that property; when you find that deal is not going through I want that property back clear' and he said 'I can give you that property back clear.' "

Mrs. Frankish told how, along in November, 1933, she learned of the existence of the trust deed against her property. In the meantime, she had received nothing but the promissory note and a few occasional payments. Her testimony in reference to this subject is as follows:

"A. I says to him 'now, see here, you go back to that company—you promised me that back clear as I handed it to you'—I says 'you go back there; you are representing me; you are my broker; and I have put faith and confidence in you'; I says 'you were making this deal for me'; I says 'you

go back to that company and see just what they will do. I want that property back clear or $40,000.00.' "

Later, in December, she went to the company's office in Los Angeles. She wanted the payments they had promised her in the interim. Her testimony is as follows:

"A. . . . I says 'I demand to have my money then or the property back clear' and he (Rucker) says 'just wait a minute and keep cool and I will go into Mr. Schroder's office', so he went into Herman Schroder's office— Q. Who was he? A. Vice President. Q. Mr. Schroder was? A. Yes; so he brings me into his office and he acted as if he had never heard of me before. Q. Mr. Schroder did? A. Yes; and yet he did know me finally, and he says 'well, Mrs. Frankish,'—I told him—related my circumstances at the time, and I told him just the facts and the truth and I says 'you know that is the only income that mother and I have and we want that income back or we want all the property back as I handed it to you, or the money.' Q. What did he say, if anything? A. He says 'well, Mrs. Frankish, you shall have some money if Mr. Rucker and I have to take it out of our personal account; we will send you the money.' "

Along in the early part of 1934, the negotiations were still continuing. At that time Mr. Rucker informed Mrs. Frankish that he "had a very good proposition on whereby he was going to get a large market in my building". Mrs. Frankish testified that he said: " 'will you be willing to wait (this was early in January) for a few months until we get this deal through, and then we will go back to paying you your regular interest'. . . . He was dickering with the Fisher Company of Riverside to rent the property for this market, which he succeeded in making this deal with the Fisher Company and they moved in." Mrs. Frankish then testified that Mr. Rucker had never informed her that he held the property as trustee for her.

It also appears from the minutes of the executive committee of the GIS dated January 3, 1934, that the corporation recognized their obligation to return the property to Mrs. Frankish free and clear of all incumbrances, for we find those minutes read in part as follows:

"WHEREAS, it is now deemed advisable to abrogate the agreement originally entered into and return to Adele Fran-

kish her property. It is deemed advisable to request the Federal Mortgage Company, a corporation, and the officers of this corporation do hereby request the officers of Federal Mortgage Company, to transfer the title now held by it of the Frankish property to DeWitt C. Rucker, as Trustee, for Adela Frankish in consideration of the return to this Company of the promissory note of this Company issued to Adela Frankish, whenever DeWitt C. Rucker as Trustee is in position to deliver to Adela Frankish title to said property free and clear of all encumbrances and further that this corporation deliver to DeWitt C. Rucker as Trustee for Adela Frankish 400 shares of the preferred capital stock of Intermountain Title Guaranty Company now owned by this company and 420 shares of stock of the Belt Fire Insurance Company, as collateral for the purpose of acquiring two notes aggregating $20,000.00 secured by first deeds of trust on the properties originally deeded to this Company by Adela Frankish.''

We believe it is obvious from the foregoing testimony and by the excerpts from the minutes, that negotiations or plans were instituted to return this property free and clear of encumbrances to Mrs. Frankish and that she relied upon these representations. It may be noted that Rucker was even handed a lot of stock, including 400 shares of the preferred capital stock of Intermountain, to pay off Intermountain and satisfy it and to have it release or cancel the trust deed. The book value, as of April 19, 1933, of such preferred Intermountain shares, was $85 per share. Under this evidence we are impelled to hold that the intent of the parties was to leave the negotiations open. Under the rule above cited, the doctrine of laches would not apply. (*Mills* v. *Richmond Co., Inc.,* 63 Cal. App. 594 [219 Pac. 465]; *Walker* v. *Harbor Business Blocks Co.,* 181 Cal. 773 [186 Pac. 356]; *Grotheer* v. *Panama-Pacific Land Co.,* 41 Cal. App. 19 [181 Pac. 667]; *Sherratt* v. *Hellman Com. T. & S. Bank,* 112 Cal. App. 542 [297 Pac. 582]; *Curtis* v. *Title Guarantee etc. Co.,* 3 Cal. App. (2d) 612, 621, 622 [40 Pac. (2d) 562, 42 Pac. (2d) 323].)

■ Further objection is made to the findings with reference to lack of restoration prior to rescission. The court specifically found:

"22. The court further finds that plaintiff received no real or substantial consideration whatsoever for the real estate thus conveyed by her to GIS. That the said sum of $1,360.00 actually paid her by GIS was the total amount paid her from any source in the transaction. . . . That the said amount included the rentals collected by her during the period she actually continued to retain possession of said business property on A Street, before and on and after March 23, 1933. That such payment constituted substantially nothing but a return to her of rents collected by GIS. That her losses by reason of the entire transaction are much greater than any such payment received by her, also, inclusive of the satisfaction of said mortgage indebtedness by GIS in the sum of $1535.29. . . .

"24. The court further finds that plaintiff did not offer to restore anything to Intermountain prior to the commencement of this action. The court finds that she had nothing of Intermountain's to restore. That plaintiff received nothing of value whatsoever, above what she was entitled to retain. That the sum of $1535.29 received by her was paid by the bankrupt GIS and that Intermountain has no claim to or interest in such sum. The court further finds that in any event plaintiff would be entitled to retain such sum. That plaintiff received nothing from Intermountain, directly or indirectly."

Appellants contend that "the person who has been misled is required, as soon as he learns the truth, with all reasonable diligence to disaffirm the contract, or abandon the transaction, and give the other party an opportunity of rescinding it, and of restoring both of them to their original position. He is not allowed to go on and derive all possible benefits from the transaction, and then claim to be relieved from his own obligations by a rescission or a refusal to perform on his own part." (Citing Pomeroy's Equity Jurisprudence, 4th ed., sec. 897.) *"He must restore to the other party everything of value* which he has received from him under the contract; or must offer to restore the same, upon condition that such party shall do likewise, unless the latter is unable or positively refuses to do so." (Civ. Code, sec. 1691, subd. 2.)

The evidence discloses the fact that the GIS did pay off the mortgage in the sum of $1535.29 that was against the Frankish property at the time of the transfer to it. ' It is also true that respondent received payments of interest and collected rents on the property for a period after the transfer, amounting to the sum of $1360. Appellants apparently forget that respondent was, during all of this time, entitled to a payment of interest at the rate of six per cent on the gold bonds or the promissory note which was due her under her agreement. This sum would offset any and all amounts actually received by her.

It is also claimed by respondent that the GIS agreed to assume the small mortgage on the property in the original transaction. (*Peterson* v. *Wagner*, 52 Cal. App. 1 [198 Pac. 25] ; 4 Cal. Jur. 768.) We feel that the finding as to restitution is amply supported by the evidence.

The trial court made a further finding that the permits of the corporation commissioner had been disregarded in reference to the transactions. Appellants complain of this finding in this, that it is not supported by the evidence. A permit was issued by the corporation commissioner to the GIS to issue its securities, to wit, 30,992 class A, series 1, shares, and 60,688, class B shares, in exchange for certificates evidencing the issued and outstanding preferred and common shares of Intermountain. A similar permit was issued March 15, 1933, expiring June 15, 1933, allowing the GIS to sell and issue to Charles W. Rollinson and Adele Frankish its series A, first lien collateral gold notes in an amount of not to exceed $60,000, as consideration for the real and personal property described in the application for the permit, with certain reservations and conditions. It is apparent from the record that no securities were sold or issued to Mrs. Frankish under the second permit above mentioned. The first permit mentioned becomes involved in so far as it may substantially affect the purported exchange of securities between the GIS and the Intermountain. Appellants contend that they were innocent purchasers for value of the $20,000 trust deed on the Frankish property and that it was by virtue of an exchange agreement and the authority of this permit, that they parted with value.

Respondent contends that at no time thereunder did GIS transfer unto Intermountain any of the capital stock of GIS and that all of such shares of Intermountain stock acquired by GIS was paid for by GIS with other considerations, and not by capital stock of GIS and that in all respects such transaction between these two corporations was carried out in complete disregard of the above-mentioned permit, and also in substantial disregard of the written contract between the two corporations.

The contract to which reference is made was dated October 7, 1932, between the GIS and the Intermountain, wherein Intermountain agreed to purchase 2,917 shares of the capital stock of the Belt Fire Insurance Company (another subsidiary) at a value of $58,341.01, together with notes secured by mortgages and/or trust deeds of a face value of $35,000. Intermountain, in consideration of this sale, agreed to transfer to GIS all of the capital stock of the Intermountain Securities Corporation, a company to be organized, which company was to own 28 per cent interest in the various plants owned by the Intermountain, stock subscription notes, and other assets. The Intermountain also agreed to use their best efforts to cause to be exchanged, not less than 51 per cent of the preferred and common stock of the Intermountain, for the capital stock of the GIS, within one year from the date of the agreement, on the basis therein specified.

The evidence indicates that the GIS acquired in the transaction, from 51 per cent to at least 80 per cent of the stock of the Intermountain.

Respondent further advances the theory that the GIS had no permit which would authorize it to issue its promissory note in the sum of $40,000 in exchange for the Frankish properties and therefore the note being a security, disposed of by the GIS without obtaining a permit so to do, was in violation of the Corporate Securities Act; that these transactions were consequently void as a matter of law.

It is true that a sale or issue materially deviating from the conditions of the permit is invalid by the language of the act. (*Domenigoni* v. *Imperial Live Stock & Mortgage Co.*, 189 Cal. 467 [209 Pac. 36] ; *Becker* v. *Stineman*, 115 Cal. App. 740 [2 Pac. (2d) 444] ; 6A Cal. Jur. 605, sec. 338.) It was held in the case of *Herkner* v. *Rubin*, 126 Cal. App. 677 [14

Pac. (2d) 1043], that where a permit required a sale for cash but deliveries were paid for by merchandise instead of cash, the agreement was void. We believe that it will be unnecessary to a proper determination of the ultimate decision to pass upon the question of the permit or to give further consideration to the legal effect of the contract and the exchange thereunder if there was other sufficient evidence to support the finding of the court that the Intermountain had notice of the alleged fraudulent transaction and was not an innocent *bona fide* purchaser for value.

■ The fundamental rule may be thus stated. To be a *bona fide* purchaser one must have purchased in good faith and for a valuable consideration and must have had no knowledge or notice of prior rights at the time of his purchase or at any time prior to payment of the purchase money. (25 Cal. Jur., p. 821, sec. 268.)

■ Guided by the light of this rule, let us review portions of the evidence bearing upon this phase of the controversy. It must be remembered that among the officers and directors of the GIS as of January 17, 1933, as disclosed in a statement prepared by them were DeWitt C. Rucker, vice-president in charge of fire operations, director of real estate and insurance since 1919 for San Jose and San Francisco, past president of the San Jose Realty Board; W. Herman Schroder, director of Belt Fire Insurance Company; R. G. Kemp, director, vice-president and manager of the Intermountain Title Guarantee Company and eleven or twelve others of equal or greater importance. This data submitted to respondent contained the following statement:

"January 17th, 1933: Gentlemen: As per your request, I am submitting certain data in connection with General Insurance Securities, Ltd., and its subsidiary Companies. The General Insurance Securities, Ltd., is a Nevada corporation, organized for the purpose of acquiring control of, financing and operating Insurance and Finance Companies, and for the purpose of developing agency organization, created in 1912 by Fred C. Nichols and his associates, known as the Belt Agency Organization. The General Insurance Securities, Ltd., owns the control of the Belt Fire Insurance Company of Los Angeles, the Belt Casualty Company of Chicago, Illinois, the Transpacific Life Insurance Company of Los

Angeles, and the Federal Mortgage Company. This latter corporation is a Finance Company organized under the laws of the State of Delaware, but has its home office in Los Angeles, California. In addition to these Companies, the General Insurance Securities, Ltd., has entered into a contract for the purchase of the control of the Intermountain Title Guaranty Company, a corporation of Salt Lake City, and it is expected that this contract will be completed within a very short time now as it has already been approved by the Division of Investments, Department of Corporations, of the State of California. . . .

"The General Insurance Securities, Ltd., is not a Holding Company in the accepted sense of that term, but is rather an Operating Company, controlling through active management and stock ownership the organization of the Companies referred to above. . . .

"Either one or some of the companies owned by the General Insurance Securities, Ltd., are licensed to do business in the following states. . . .

"Later on the stock of these two companies was sold through the method of a stock-exchange to the General Insurance Securities, Ltd., which company shortly afterward acquired the stock ownership of the Federal Mortgage Company and has entered into a contract for the purchase of the stock of the Intermountain Title Guaranty Company and of the Transpacific Life Insurance Company. . . .

"Therefore, the gold note issue referred to above which has been authorized by the Division of Investments, Department of Corporations of the State of California, is intended to be used to acquire such assets as can be used to increase the capital and surpluses of these subsidiary companies."

The minutes of the GIS dated January 28, 1933, read in part as follows:

"Resolved: That the officers of General Insurance Securities, Ltd., be and they are hereby authorized and empowered to contribute to Federal Mortgage Company, an undivided one half interest in the Frankish property, and

"BE IT FURTHER RESOLVED: That the officers of General Insurance Securities, Ltd., be and they are hereby authorized and empowered to sell to Federal Mortgage Company the other one half interest in the Frankish property,

for the sum of $20,000.00 in consideration of their issuing a note secured by a First deed of Trust on the property in favor of the Intermountain Title Guaranty Company.''

This resolution was later rescinded by the GIS because it was in conflict with certain permits issued by the corporation commissioner. The minutes of the Intermountain as of January 31, 1933, indicate that among the six or seven persons elected as directors of that corporation were R. G. Kemp, general manager and secretary-treasurer, and W. Herman Schroder. At this meeting the Intermountain authorized a conversion of their stock for the stock of the GIS. Mervyn Hope, a member of the executive committee of the GIS was also elected vice-president of the Intermountain. Mr. Kemp, representing the Intermountain, came from Salt Lake City to Los Angeles to investigate the proposed deal with GIS and was shown the corporation commissioner's permit. Of interest is an analytical report of various subsidiaries by a committee composed of Mervyn Hope, J. W. Frawley and DeWitt C. Rucker, as of March 4, 1933, wherein they report as follows:

''It is apparent after reading this report that the companies are becoming more insolvent every day, and it is therefore necessary for the Executive Committee to take definite action immediately.''

This date is prior to the date of the trust deed given by the Federal to the Intermountain.

On November 17, 1933, by resolution, we find that GIS favored Intermountain with a release of any and all dividends due on the Intermountain preferred stock. The minutes are replete with authorizations of contributions from the GIS to the Intermountain. On July 27, 1933, such a contribution was authorized in the sum of $50,000, to settle a judgment and have sufficient available assets to extend the operations of the Intermountain.

All parties are agreed that the Federal was never indebted to the Intermountain and that at the time of the execution of the trust deed by the Federal in favor of the Intermountain, no consideration passed between them. After hearing all the evidence the trial court found, and we think properly so:

"that as a part of such contract Intermountain agreed to transfer to GIS certain of the capital stock of such corporation by indirect means . . .

"That at no time thereunder did GIS transfer unto Intermountain any of the capital stock of GIS, and that all of such shares of Intermountain stock acquired by GIS, inclusive of the entire 93% or approximately 93%, secured by GIS prior to June 1, 1933, was paid for by GIS by other considerations, and not by capital stock of GIS; and that in all respects such transaction between these two corporations was carried out in complete disregard of said Permit of the Corporation Commissioner of the State of California, and also in substantial disregard of the said written contract made by and between said two corporations on or about October 7, 1932. . . .

"10. That by resolution of the Executive Committee of GIS, held April 6, 1933, it was provided that the action of GIS in contributing plaintiff's property to Federal, in consideration of the latter company issuing its trust deed to Intermountain for $20,000, was in conflict with the Permits issued by the Corporation Commissioner of California, and that thereupon the said Executive Committee rescinded, annulled and cancelled such grant and conveyance. . . .

"14. The court further finds that while Intermountain through its testimony asserted that the entire transaction between it and GIS was completed by the giving and the acceptance of this $20,000 promissory note and trust deed. . . . That nevertheless thereafter GIS offered to give or gave Intermountain large sums in the form of gifts or contributions. That GIS as an unwritten part of the original contract between these two corporations, agreed to and did waive all claims to dividends on Intermountain stock up to January 1, 1935. That it also entered into an arrangement or contract with Intermountain to contribute $9,000 cash to the latter company, on January 29, 1934. The court further finds that on or about July 27, 1933, the Executive Committee of GIS offered to contribute 617 shares of Intermountain preferred stock to that company, having a value of approximately $50,000; and that Intermountain was favored by GIS in substantial sums of money, called contributions at a time when GIS was facing insolvency. . . .

"19. The court finds that on or prior to July 27, 1933, Intermountain had requested GIS to furnish it with additional capital in the form of a contribution or gift of $50,000; that at such time GIS by Resolution provided that it was ready and willing to contribute 617 shares of preferred stock of Intermountain to the latter company having a book value of substantially $50,000; and at such time also requested Intermountain to cancel and return said $20,000 promissory note secured by trust deed on said described realty, in exchange for other securities of like value, secured by first mortgages or trust deed on other properties. . . .

"20. The court finds that by resolution of the Executive Committee of GIS adopted January 3, 1934, it was provided: to abrogate the agreement originally entered into and return to Adele Frankish, plaintiff herein, the said real property. That such resolution further provided, to request Federal to transfer the title thereof to the said Rucker, as Trustee for plaintiff, and to secure back from plaintiff said $40,000 promissory note, whenever the said Rucker, as Trustee, was in position to deliver to plaintiff title to said property free and clear of all encumbrances; and that thereupon by said resolution certain valuable assets were turned over unto said Rucker for the purpose of carrying out such abrogation and return unto her all of said real estate free and clear of any and all encumbrances. . . .

"21. . . . That certain liens were also filed against both of said properties for the costs involved in the removal of such wall and other incidental work, and all to plaintiff's loss and damage."

Appellants are quite insistent that the facts, as established, do not under any stretch of the imagination constitute notice to the Intermountain, and as vehemently claim their status to be that of a *bona fide* purchaser for a valuable consideration. In support of their position they cite *Mercantile Nat. Bank* v. *Parsons*, 54 Minn. 56 [55 N. W. 825, 40 Am. St. Rep. 299] (1893), an action to foreclose a mortgage, wherein this language was used: "Generally, and for most purposes, a corporation is a legal entity distinct from the body of its stockholders; and in any event, to render the knowledge of the individual corporators the knowledge of the corporation it must be the knowledge of all the corporators." Also cited

is *Lothian* v. *Wood,* 55 Cal. 159; *Utah Const. Co.* v. *Western Pac. Ry. Co.,* 174 Cal. 156 [162 Pac. 631]; *Havens* v. *Dale,* 18 Cal. 359; *Ross* v. *Wellman,* 102 Cal. 1 [36 Pac. 402].

█ It seems to be the well-settled rule that where a plaintiff attacks a conveyance as being in fraud of his rights, it is incumbent upon him first to show the fraudulent intent of the vendor. The burden then shifts to the purchaser to show a valuable consideration, and, this shown, the burden again shifts to the plaintiff, who must show the vendee's knowledge of the fraudulent intent of the vendor. (*Ross* v. *Wellman, supra.*)

The state of facts here disclosed does not present a case where an agent gains knowledge in the commission of acts in which he has an interest hostile and adverse to his principal, which furnishes a basis for an exception to the general rule announced in the above cited cases, but clearly herein all the acts of the common agents of all companies were conceived, arranged, and performed for the benefit of the respective companies, not for the agent himself, and each company derived and retained the benefit of the acts in question. The GIS received a credit of $20,000 on this trust deed and the Intermountain received a note in that same amount secured by a trust deed on the property.

From the foregoing, it follows that in so far as the GIS and the Intermountain as corporate entities are concerned, both had knowledge of the fraud perpetrated, both were recipients of benefit therefrom, and both, by their legal and corporate agents, participated therein. Under these circumstances, in arriving at the ultimate conclusion, we need but refer to the well-reasoned case of *Verder* v. *American Loan Soc.,* 1 Cal. (2d) 17, at page 27 [32 Pac. (2d) 1081], wherein our Supreme Court said:

"The agents of each company being the same, acting at the same instant in dual capacities in the transaction of their principals' business *inter sese,* were carriers of such knowledge to both principals synchronously, with the result that each company principal is charged with all the knowledge and acts of its agents, gained or performed in transacting the business of the respective companies." (Citing *McKenney* v. *Ellsworth,* 165 Cal. 326 [132 Pac. 75]; *Williams* v. *Hasshagen,* 166 Cal. 386, 393 [137 Pac. 9]; *National Bank of San Mateo* v. *Whitney,* 40 Cal. App. 276 [180 Pac. 845];

*Live Oak Cemetery Assn.* v. *Adamson,* 106 Cal. App. (Supp.) 783 [288 Pac. 29].)  See, also, *Blue Diamond Plaster Co.* v. *Industrial Acc. Com.,* 188 Cal. 403 [205 Pac. 678] ; *Gonzalez* v. *Interstate Guaranty Co.,* 218 Cal. 612 [24 Pac. (2d) 462].

In the light of the reasoning expressed, we are of the opinion that the judgment of the trial court must be and is accordingly affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 6, 1939.