[Civ. No. 38869. First Dist., Div. Four. Dec. 2, 1976.]

GERALD A. CROWLEY et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Respondents.

## COUNSEL

Stephen Warren Solomon and Richard Goldman for Plaintiffs and Appellants.

Thomas M. O'Connor, City Attorney, and Milton H. Mares, Deputy City Attorney, for Defendants and Respondents.

## OPINION

**CHRISTIAN, J.**—The San Francisco Police Officers Association appeals from a judgment which denied relief upon its complaint for an injunction and a writ of mandate requiring respondents, the City and County of San Francisco, its mayor, board of supervisors, and police commission to give effect to certain agreements regulating the terms of service of San Francisco police officers. We reverse the judgment.

On April 17, 1974, appellants entered into an agreement with the mayor and the police commission of the City and County of San Francisco (hereinafter the commission). This "Memorandum of Understanding" was subsequently approved by the San Francisco Board of Supervisors (resolution No. 374-74). The Police Officers Association agreed to "forego the power to strike in full or by slow-down or medical excuses" during the three-year term of the agreement in consideration of an arbitration procedure and other matters. The agreement also contained a "police officers' bill of rights" and imposed a mutual obligation to meet and confer in good faith as to all police department employment conditions except "wages and employment conditions specifically governed by the Charter of the City and County of San Francisco." The agreement stated that it was to remain in effect for three years from its effective date "subject to reopening for amendments . . . upon written notice by either party to the other ninety (90) days prior to the expiration date of the Agreement."

On August 18 through August 21, 1975, appellants went out on strike because the city's board of supervisors refused to agree to appellants' wage demands. The strike ended on August 21, 1975, when Mayor Alioto invoked his emergency powers under the city charter and adopted a settlement agreement by proclamation, as an emergency ordinance,

without involving the board of supervisors. This 1975 "Memorandum of Agreement" provided for a 13.05 percent pay increase for appellants and amnesty from any reprisals arising out of the strike. Appellants agreed that in consideration of this agreement and the proclamation implementing it, appellants would not "authorize or in any way encourage a strike, slowdown or other economic action on the part of their members for any purpose" during the term of the agreement. The 1975 agreement, signed by the mayor, also stated that "All existing agreements and memoranda of understanding shall continue in full force and effect."

Approximately two months later, on October 23, 1975, the police commission passed its resolution No. 414-75, rescinding its approval of the April 17, 1974, Memorandum of Understanding. The commission based its action on the fact that "the Police Officers' Association as a party to this Memorandum has materially breached [the agreement] by calling a strike . . . on 18 August 1975 and by promoting and encouraging the continuation of said strike." The board of supervisors also rescinded its approval of the 1974 Memorandum of Understanding.

Appellants brought this action to compel the city to abide by the terms and conditions of that agreement; the court rendered judgment for respondents.

Relying on *Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328 [124 Cal.Rptr. 513, 540 P.2d 609], appellants contend that a memorandum of agreement governing employee relations, once adopted by a public entity, is binding. The city rejoins that the April 17, 1974, Memorandum of Understanding was unenforceable at law because it was not supported by consideration (*Western Lith. Co.* v. *Vanomar Producers* (1921) 185 Cal. 366 [197 P. 103]; see Civ. Code, §§ 1550, 1605) or was supported only by unlawful consideration (*Asher* v. *Johnson* (1938) 26 Cal.App.2d 403 [79 P.2d 457]; Civ. Code, §§ 1607, 1608, 1667). The argument is that appellants suffered no legal detriment in agreeing not to strike since public employees do not have the right to strike. Moreover, respondents argue that such consideration is unlawful because contrary to public policy. (Civ. Code, §§ 1667, 1608.) ■ It is true that, absent an authorizing statute, public employees in California do not have the right to strike. (*Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen* (1960) 54 Cal.2d 684, 687 [8 Cal.Rptr.

1, 355 P.2d 905]; *Los Angeles Unified School Dist.* v. *United Teachers* (1972) 24 Cal.App.3d 142, 145 [100 Cal.Rptr. 806].) ▮ However, reference to two recent California Supreme Court decisions (*Glendale City Employees' Assn., Inc.* v. *City of Glendale, supra,* 15 Cal.3d 328, and *City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898 [120 Cal.Rptr. 707, 534 P.2d 403]) establishes that the 1974 Memorandum of Understanding was valid.

*City and County of San Francisco* v. *Cooper, supra,* involved the validity of an ordinance of the City of San Francisco and of a resolution of the San Francisco school board adopted after strikes by San Francisco teachers and other municipal employees. During the two strikes, negotiations were entered into by employee association representatives and representatives of the city and school district. These "meet and confer" sessions resulted in the adoption of legislative measures by both the board of supervisors and the San Francisco school board. When two taxpayers' suits were filed challenging the validity of these legislative measures, the city comptroller refused to implement the salary increases called for by the measures. The city and the school district then sought a writ of mandate to compel the comptroller to draw and deliver warrants reflecting the salary increases granted by the ordinance and resolution. The Supreme Court granted the writ rejecting, among other challenges, the taxpayers' initial claim that both measures were enacted under the coercive influence of an "illegal" public employees' strike. The Supreme Court first noted that "the ordinance and resolution at issue here are clearly legislative in nature. (See, e.g., *Kugler* v. *Yocum* (1968) 69 Cal.2d 371, 374 [71 Cal.Rptr. 687, 445 P.2d 303]; *City & County of San Francisco* v. *Boyd* [1943] 22 Cal.2d 685, 689 [140 P.2d 666].)" The court then stated that "the validity of legislative acts must be measured by the terms of the legislation itself, and not by the motives of, or influences upon, the legislators who enacted the measure." (*City and County of San Francisco* v. *Cooper, supra,* 13 Cal.3d 898, 911-913, citing *People* v. *County of Glenn* (1893) 100 Cal. 419, 423 [35 P. 302].)

A corollary rule was declared in *Glendale City Employees' Assn., Inc.* v. *City of Glendale, supra,* 15 Cal.3d 328. In that case, the California Supreme Court held that, under the provisions of the Meyers-Milias-Brown Act (Gov. Code, §§ 3500-3510), a memorandum of understanding, once adopted by the governing body of a public agency, is binding upon the agency. In *Los Angeles County Firefighters Local*

*1014* v. *City of Monrovia* (1972) 24 Cal.App.3d 289, 294-295 [101 Cal.Rptr. 78], the court stated:

"The city contends that [section 3500 of the act] specifically exempts it from the application of the act since its preexisting rules and policies 'provide for other methods of administering employer-employee relations.'

". . . . . . . . . . . . . . . . . . .

"It appears from our examination of the entire act that the Legislature intended by it to set forth reasonable, proper and necessary principles which public agencies must follow in their rules and regulations for administering their employer-employee relations, including therein specific provisions for the right of public employees, as individuals and as members of organizations of their own choice, to negotiate on equal footing with other employees and employee organizations, without discrimination; that the Legislature did not intend thereby to preempt the field of public employer-employee relations except where public agencies do not provide reasonable 'methods of administering employer-employee relations through . . . uniform and orderly methods of communication between employees and the public agencies by which they are employed' (§ 3500); and that *if the rules and regulations of a public agency do not meet the standard established by the Legislature, the deficiencies of those rules and regulations as to rights, duties and obligations of the employer, the employee, and the employee organization, are supplied by the appropriate provisions of the act.*" (Italics added.) The statute applies in the present case (see *Los Angeles County Firefighters Local 1014* v. *City of Monrovia, supra*); it gives effect to a memorandum of understanding once it is properly approved; no mention is made of consideration, and it does not appear that the Legislature intended to subordinate the statutory scheme to traditional concepts of consideration in the law of contracts. We conclude that, under section 3505.1 of the Government Code, the 1974 Memorandum of Understanding, once approved by the board of supervisors, became binding on the city. (See also *Huntington Beach Police Officers' Assn.* v. *City of Huntington Beach* (1976) 58 Cal.App.3d 492, 496 [129 Cal.Rptr. 893].)

It remains to be considered what effect each of the following acts had on the continuing validity of the 1974 agreement:

(1) The August 1975 strike in violation of the no-strike provision.

(2) Mayor Alioto's emergency proclamation and the memorandum of agreement he entered into with appellants on August 21, 1975.

(3) Respondents' resolution of October 23, 1975, rescinding its approval of the 1974 Memorandum of Understanding.

1. *The Strike of August 1975*

Respondents argue that appellants' strike of August 1975, in violation of the no-strike provision of the 1974 agreement, was a material breach of that agreement, justifying respondents' rescission of the contract (Civ. Code, § 1689; *Crofoot Lumber, Inc.* v. *Thompson* (1958) 163 Cal.App.2d 324 [329 P.2d 302]). Without citation of authority, appellants argue that contractual doctrines of consideration and rescission are inapplicable to the collective agreements in question. In *Glendale City Employees' Assn., Inc.* v. *City of Glendale, supra,* 15 Cal.3d 328, 339-340, the Supreme Court stated:

"In pre-Wagner Act days some courts considered collective bargaining agreements to be merely statements of intention or unilateral memoranda. (See Chamberlain, *Collective Bargaining and the Concept of Contract* (1948) 48 Colum.L.Rev. 829, 832; Annot. (1935) 95 A.L.R. 10, 34-37.) But all modern California decisions treat labor-management agreements whether in public employment or private as enforceable contracts (see Lab. Code, § 1126) which should be interpreted to execute the mutual intent and purpose of the parties.

"This principle applies as much to agreements between government employees and their employers as to private collective bargaining agreements. Agreements reached under the Meyers-Milias-Brown Act, like their private counterparts, are the product of negotiation and concession; they can serve as effective instruments for the promotion of good labor-management relations only if interpreted *and performed* in a manner consistent with the objectives and expectations of the parties." (Italics added.)

A distinct body of contract law relating to collective bargaining agreements in the private sector has been evolving. (*Textile Workers* v. *Lincoln Mills* (1957) 353 U.S. 448, 456 [1 L.Ed.2d 972, 980, 77 S.Ct. 912].)[1] Labor law commentators have emphasized the difference between collective agreements and "ordinary" contracts and have cautioned against blind application of traditional contract doctrines to collective bargaining agreements; but it is not correct to say that the legal principles applicable to ordinary contracts have no relevance to collective agreements (see Summers, *Collective Agreements and the Law of Contracts,* 78 Yale L.J. 525, 527; Cox, *Reflections Upon Labor Arbitration,* 72 Harv.L.Rev. 1482, 1489; Cox, *The Legal Nature of Collective Bargaining Agreements,* 57 Mich.L.Rev. 1, 14-19). The federal courts have utilized fundamental principles of contract law as decisional criteria for private sector collective bargaining agreements (see *Children's Rehab. Ctr., Inc.* v. *Service Emp. Int. U. Loc.* 227 (3d Cir. 1974) 503 F.2d 1077, 1079, cert. den., 419 U.S. 1090 [42 L.Ed.2d 682, 95 S.Ct. 681]; *United Elec., R. & M. Wkrs.* v. *National Labor Rel. Bd.* (1955) 223 F.2d 338, 341 [96 App.D.C. 46]; *Byerly* v. *Duke Power Company* (4th Cir. 1954) 217 F.2d 803, 806-807; *Boeing Airplane Co.* v. *Aeronautical Indus. Dist. Lodge No. 751, Internat. Ass'n of Machinists* (9th Cir. 1951) 188 F.2d 356, 357; *United Steel Workers of America* v. *Rome Industries, Inc.* (N.D.Ga. 1970) 321 F.Supp. 1170, 1174-1175, affd. 437 F.2d 881; *Local Joint Exec. Bd.* v. *Nationwide Downtowner Motor Inns* (W.D.Mo. 1964) 229 F.Supp. 413, 416-417; *Reinauer Transp. Cos.* v. *United Marine Division* (S.D.N.Y. 1953) 112 F.Supp. 940). In *United Elec., R. & M. Wkrs.* v. *National Labor Rel. Bd., supra,* 223 F.2d 338, 341, the court stated: "It is general law that one party to a contract need not perform if the other party refuses in a material respect to do so. And that rule applies to labor contracts. Moreover, in cases where the breach is a strike in violation of a collective bargaining agreement, as in the instant case, application of the rule is supported by the rationale underlying such agreements. The prevention of strikes is one of the principal purposes of labor contracts and of the Act. A no-strike provision is 'The chief advantage which an employer can reasonably expect from a collective labor agreement.' The walkout was a material breach which justified the subsequent rescission of the contract by the Company." (See *Boeing Airplane Co.* v. *Aeronautical Indus. Dist. Lodge No. 751, Internat. Ass'n of Machinists, supra,* 188 F.2d 356, 357; *United Steel Workers of America* v. *Rome Industries, Inc., supra,*

[1]Federal law precedents have often been invoked by the California courts in construing the Meyers-Milias-Brown Act. (See, e.g., *Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608, 616 [116 Cal.Rptr. 507, 526 P.2d 971]; *Social Workers' Union, Local 535* v. *Alameda County Welfare Dept.* (1974) 11 Cal.3d 382, 391 [113 Cal.Rptr. 461, 521

321 F.Supp. 1170, 1175.)[2] "Why negotiate an agreement if either party can disregard its provisions? What point would there be in reducing it to writing, if the terms of the contract were of no legal consequence?" *(Glendale City Employees' Assn., Inc. v. City of Glendale, supra,* 15 Cal.3d 328, 336.) ■ While the municipal government must live up to the bargain that it has made, it is entitled to the expectation that the employees' association will do the same. The strike of August 1975 constituted a violation of appellants' contractual obligations under the 1974 Memorandum of Understanding. The walkout of the police officers was a material breach of the no-strike clause, which would justify respondents' rescission of the agreement (Civ. Code, § 1689, subd. (b)(2)).

### 2. *Mayor Alioto's Emergency Proclamation and the August 21, 1975, Memorandum of Agreement*

P.2d 453]; see also *Lipow* v. *Regents of University of California* (1975) 54 Cal.App.3d 215, 225 [126 Cal.Rptr. 515].)

[2]A recent third circuit case, *United Steelworkers of Am., AFL-CIO-CLC* v. *N.L.R.B.* (3d Cir. 1976) 530 F.2d 266, 280-281 (cert. den., 429 U.S. 834 [50 L.Ed.2d 100, 97 S.Ct. 100]), has held that a strike in breach of a collective bargaining contract does not *automatically* give the employer the right to terminate the contract when both legal and contractual remedies short of contract termination were available to the employer:

". . . Accordingly we disapprove the rule that holds a strike in breach of a contract *automatically* gives the employer the right to terminate the contract. As Professor Cox observed some years ago in criticizing the *Marathon Electric* rule:

"A collective bargaining contract is made to be broken. The number of people involved, both as employees and as supervisors, makes large and small violations inevitable. This is one reason for the grievance procedure and arbitration. Collective agreements are negotiated for substantial periods after much travail. There are enormous pressures to reach agreement. There will be no rules to govern the enterprise if the contract is set aside. These are proper factors to evaluate in determining whether a breach is material. They *argue for continuing the contract and leaving the injured party to his legal or contractual remedies.* Consequently, I am skeptical of the trend toward holding that a strike in breach of contract automatically gives the employer the right to terminate the agreement. There would seem to be room for judgment based upon the length of the strike, the number of employees affected, the injury to the employer, *the degree of fault upon the part of the union,* and the likelihood that the contract will be honored for the remainder of its term. Cox, *The Legal Nature of Collective Bargaining Agreements,* 57 Mich.L.Rev. 1, 18-19 (1958) (footnote omitted and emphasis added).

"*Here, the company had both legal and contractual remedies available to it short of contract termination.* Legally, it could have compelled completion of the grievance procedure or filed a Section 301 damage suit. Under the contract, it could have taken affirmative steps to have the underlying dispute submitted to arbitration. It did neither. . . . *In short, analogies between contract principles and the law of labor agreements are helpful to a point; when an analogy would dictate a result contrary to the paramount interests in labor peace, however, it should not control. See United Steelworkers of America* v. *Warrior & Gulf Navigation Co., supra,* 363 U.S. at 578 81, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)." (Italics added.)

Appellants contend that, even if the strike constituted a material breach of the 1974 agreement justifying rescission of that agreement, respondents' notice of rescission came too late because the breach had been waived. Appellants argue that the right to rescind a contract for a breach may be waived and that the 1975 Memorandum of Agreement signed by Mayor Alioto constituted such a waiver.

At the time in question, section 3.100 of the Charter of the City and County of San Francisco provided in pertinent part: "In case of a public emergency involving or threatening the lives, property or welfare of the citizens, or the property of the city and county, *the mayor shall have the power, and it shall be his duty,* to summon, organize and direct the forces of any department in the city and county in any needed service; to summon, marshal, deputize or otherwise employ other persons, *or to do whatever else he may deem necessary for the purpose of meeting the emergency.*" (Italics added.) As noted above, because the San Francisco Board of Supervisors refused to agree to appellants' wage demands, appellants went out on strike against the City and County of San Francisco on August 18 through August 21, 1975. The strike ended on August 21, when Mayor Joseph Alioto invoked his emergency powers under section 3.100 of the city charter and adopted a settlement agreement by proclamation, as an emergency ordinance, without involving the board of supervisors.

In *Verreos* v. *City and County of San Francisco* (1976) 63 Cal.App.3d 86 [133 Cal.Rptr. 649], Mayor Alioto's actions were attacked on the grounds that (1) section 3.100 of the charter was unconstitutional because violative of the due process clause; (2) no public emergency existed when the mayor issued his proclamation declaring the state of emergency; and (3) the mayor acted fraudulently and in bad faith when he issued the emergency proclamation and granted the police and firemen the salary raises they had demanded. The Court of Appeal held in *Verreos* that section 3.100 of the city charter was constitutional and stated that "Since that section grants broad powers to the mayor only under unusual circumstances calling for immediate action and since the mayor's actions under the section must be reasonable and are subject to judicial review, we conclude that the section fully comports with the requirements of the due process clause." (63 Cal.App.3d at p. 97; see *Mullins* v. *Henderson* (1946) 75 Cal.App.2d 117, 134 [170 P.2d 118].) The court also held that a public emergency within the meaning of section 3.100 of the city charter existed on August 21, 1975, as a matter of law, stating that ". . . [It]

cannot be denied that when a substantial number of the members of both [the police and fire] departments conduct a strike against the citizens of a highly populated metropolitan area, where serious crimes and fires are a daily fact of life, there is, as a matter of law, a 'public emergency involving or threatening the lives, property or welfare of the citizens, or to property of the city and county' within the meaning of section 3.100 of the charter." *(63 Cal.App.3d at pp. 107-108.)* Lastly, the *Verreos* court held that the mayor, in granting the salary increase, was acting legislatively and that "courts will not interfere with salary legislation in the absence of fraud or action so palpably unreasonable and arbitrary as to indicate an abuse of discretion as a matter of law." (63 Cal.App.3d at p. 108; *City and County of S.F.* v. *Boyd* (1943) 22 Cal.2d 685, 690 [140 P.2d 666].)

In addition to the salary increase provisions, which were attacked in *Verreos,* the August 1975 Memorandum of Agreement contained an amnesty provision and a clause providing that *"All existing agreements and memoranda of understanding shall continue in full force and effect."* (Italics added.) It is appellants' contention that the mayor, by treating the existing agreements as binding and specifically providing that those agreements should continue in effect after having full knowledge of the breach, waived any right the city had to rescind the contract for appellants' material breach.

The express provisions of the August 1975 agreement signed by the mayor constituted an attempt by the mayor to waive any right of rescission respondents had for appellants' breach of the no-strike provision. (See *Soon* v. *Beckman* (1965) 234 Cal.App.2d 33, 36 [44 Cal.Rptr. 190]; *Mayer* v. *Northwood Textile Mills* (1951) 105 Cal.App.2d 406, 410 [233 P.2d 657]; *LeClercq* v. *Michael* (1948) 88 Cal.App.2d 700, 702 [199 P.2d 343]; *Panno* v. *Russo* (1947) 82 Cal.App.2d 408, 411 [186 P.2d 452]; *Frankish* v. *Federal Mortgage Co.* (1939) 30 Cal.App.2d 700, 708 [87 P.2d 90]; Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 625, p. 533, § 694, p. 584; see also *Leeper* v. *Beltrami* (1959) 53 Cal.2d 195, 211, 216 [1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803].) A public emergency within the meaning of section 3.100 of the city charter existed. *(Verreos* v. *City and County of San Francisco, supra,* 63 Cal.App.3d 86, 107-108.) Pursuant to section 3.100, the mayor invoked his emergency powers in order to effect a strike settlement with the San Francisco police and firefighters. Under section 3.100, the mayor had the power to do whatever he reasonably deemed necessary for the purpose

of meeting the emergency. However, as the court stated in *Verreos,* the exercise of the mayor's emergency powers must be "reasonable." (*Verreos* v. *City and County of San Francisco, supra,* 63 Cal.App.3d at p. 104; see *Mullins* v. *Henderson, supra,* 75 Cal.App.2d 117, 134.) ■ But, under the circumstances of the city's lack of both police and fire protection, it cannot be said that the provision of the August strike settlement agreement, which continued in effect existing agreements, was an abuse of the broad emergency powers conferred upon the mayor by the city charter.

3. *Respondents' October 23, 1975, Resolution Rescinding the 1974 Memorandum of Understanding*

On October 23, 1975, approximately two months after the strike and the execution of the strike settlement agreement, the police commission passed resolution No. 414-75, rescinding its approval of the 1974 Memorandum of Understanding. The commission based its action on the fact that appellants had materially breached the 1974 agreement by calling, promoting and encouraging the August 1975 strike. ■ It is apparent from the above discussion that the attempted rescission was ineffective.

However, relying on *Terry* v. *Bender* (1956) 143 Cal.App.2d 198 [300 P.2d 119], and *Western Surgical Supply Co.* v. *Affleck* (1952) 110 Cal.App.2d 388 [242 P.2d 929], respondents contend that the mayor's waiver of the city's right to rescind the 1974 Memorandum of Understanding was invalid because against public policy. *Terry* v. *Bender, supra,* involved the waiver of a conflict-of-interest provision in the charter of the City of Compton, California. The *Terry* court held that the conflict-of-interest provision in the charter was enacted for the protection of the public and to promote honesty in governmental affairs, and that the requirements of a law or ordinance enacted for a public reason could not be waived by an official or a governmental body. (*Terry* v. *Bender, supra,* 143 Cal.App.2d at p. 214; see Civ. Code, § 3513.) In *Western Surgical Supply Co.* v. *Affleck, supra,* 110 Cal.App.2d at page 392, the court held that a board or public official has no power to waive or consent to a violation of certain penal provisions contained in the Pharmacy Act, the Dangerous Drug Act and the Poison Act. Both *Terry* v. *Bender* and *Western Surgical Supply Co.* v. *Affleck* concerned specific laws or ordinances enacted for the public's protection. Neither involved waiving the right to rescind a contract. ■ Moreover, it is evident

that here public policy would favor the resolution of the public emergency that existed and the promotion of peaceful labor-management relations between the city and its employees.

The judgment is reversed with directions to render judgment for appellants.

Caldecott, P. J., and Rattigan, J., concurred.

A petition for a rehearing was denied December 20, 1976, and respondents' petition for a hearing by the Supreme Court was denied January 27, 1977.