[Civ. No. 36065. First Dist., Div. One. Dec. 8, 1975.]

ARTHUR LIPOW et al., Plaintiffs and Appellants, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,
Defendant and Respondent.

**COUNSEL**

Van Bourg, Allen, Weinberg, Williams & Roger, Victor J. Van Bourg and Stewart Weinberg for Plaintiffs and Appellants.

Donald L. Reidhaar and Milton H. Gordon for Defendant and Respondent.

## OPINION

**LAZARUS, J.**\*—This is an appeal from a judgment below denying a petition for a writ of mandate to compel the Regents of the University of California to set aside the final revised version of section 52 of the university's Administrative Manual issued on February 1, 1973. The section in question deals, inter alia, with appointment and reappointment of instructors and professors.

The University Council of the American Federation of Teachers, AFL-CIO, was the sole petitioner when the proceedings were first commenced in 1971 for the issuance of a writ of mandate to compel respondent, by and through its representatives, to meet and confer with the council over any proposed changes in the academic personnel rules. The council is a labor organization representing a large number of the faculty members at the university. Arthur Lipow and John G. Leonard were added as petitioners by amendment to the petition filed over a year later. There was a pretrial conference at which a joint pretrial statement was filed in which the facts referred to hereinafter were admitted. At the subsequent trial, judgment was in favor of the respondent.

The crucial question here is as to whether or not the Regents did in fact meet and confer in good faith with appellant the University Council as the bargaining representative of the faculty members who belong to the University Council as required by Government Code section 3530.[1]

### DID THE REGENTS MEET AND CONFER IN GOOD FAITH WITH THE UNIVERSITY COUNCIL?

Appellants' claim is based on Government Code section 3530 which directs that "The state by means of such boards, commissions, administrative officers or other representatives as may be properly designated by law, shall meet and confer with representatives of employee organizations upon request, and shall consider as fully as such representatives deem reasonable such presentations as are made by the employee organization on behalf of its members prior to arriving at a determination of policy or course of action."

---

\*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

[1]Appellants' brief also endeavors to present a second issue involving the status of petitioners Lipow and Leonard alone that was apparently not properly raised in the trial court. Our comments in this connection will appear elsewhere.

Respondent concedes, *arguendo,* for purposes of this appeal that the Legislature has the authority to mandate the *manner* in which the university conducts its personnel policies.[2] And, although the state is only obligated under the express terms of Government Code section 3530 to "meet and confer," respondent has also conceded that this must also of necessity include the implied element of "good faith."

Appellants, on the other hand, do not deny that they participated in various meetings with university officials at certain intervals while amendments to section 52 of the manual were under consideration. Nor do they argue that respondent was obligated to arrive at an agreement with appellants. What they do contend is that respondent failed to meet and confer in good faith and that in the final analysis the revisions to section 52 were therefore unilaterally enacted by the Regents.

A. *Stipulated facts.*

The question thus presented must be resolved within the framework of the following stipulated facts:

"The University Council of the American Federation of Teachers is an Employee Organization within the meaning of Government Code Sections 3500, 3526 and 3530. The University Council has been recognized by the University of California as representing academic employees of the University of California. The University of California has met and conferred with the University Council of the American Federation of Teachers and the Local Unions affiliated with it on some of the campuses of the University of California. Arthur Lipow and John G. Leonard were, at times material to the Petition, employees of the University of California and members of the University Council. Arthur Lipow was first hired in the school year 1967 as a lecturer. Since 1970 he has been employed as an assistant professor at the Davis campus of the University of California. John G. Leonard was hired as an acting assistant professor on July 1, 1968, and was appointed assistant professor on July 1, 1970 at the San Diego campus specializing in Indian History. He was on leave without pay in India from July 1, 1970 to June 30, 1971 and was returned to his appointment as an assistant professor until his employment terminated on June 30, 1973.

---

[2]Its brief suggests that the decision in *Ishimatsu* v. *Regents of University of California* (1968) 266 Cal.App.2d 854, 863-864 [72 Cal.Rptr. 756], might be the basis of a contrary argument. That case holds that the university is a statewide administrative agency with autonomous powers concerning its personnel derived from the Constitution.

"The Regents of the University of California is a body created by the Constitution of the State of California, and has the responsibility of administering the University of California. The President of the University is Charles Hitch. On July 9, 1970, President Hitch issued a memorandum announcing proposed changes of Rule 52 of the Administrative Manual dealing with policies and procedures concerning appointments, appraisals, and notifications of intention not to reappoint instructors and assistant professors. This memorandum contained a set of Interim Rules to govern these positions and procedures until the final language of Rule 52 could be settled.

"While Arthur Lipow served as a lecturer, the Administrative Manual defined lecturer as an individual 'not under consideration for appointment in the Professorial Series'. However, at the same time, the Handbook for Faculty Members of the University of California, as early as February 1963 and as late as May 1968, stated that length of service as a lecturer and assistant professor is calculated in reviewing an employee for promotion and tenure. The March 1970 Handbook omits this reference. However, at all times it has been known that assistant professors are expected to engage in such scholarly pursuits as research and writing, whereas research is not required of a person serving in the position of lecturer. Rule 52 of the Administrative Manual contains the criteria for evaluating those persons eligible for tenure and promotion, that is, those persons in the Professorial Series which does not include lecturers; one such criterion is research. The Interim Rules set forth by President Hitch on July 9, 1970 omit reference to lecturers as part of the Professorial Series.

"In May of 1973, Petitioner Lipow was notified that his years as a 51% or more time lecturer would be counted toward his tenure and promotion review and that, consequently, his lack of research during those years would be considered in his tenure and promotion review. This was based upon the 1973 revision of Rule 52 which in turn was based upon the University's interpretation of the February 1963 and May 1968 Handbook for Faculty Members which had never before been a part of the Administrative Manual. The only notice that Lipow could have had while he was a lecturer that his time would be considered for promotion and tenure in the Professorial Series was contained in the Handbook for Faculty Members, but this information was not in the Administrative Manual. There was no notice at any time in the Handbook for Faculty Members specifically imposing the requirement of research upon lecturers prior to the change in the Administrative

Manual in 1973. Petitioner Lipow did not perform research while he served as a lecturer. The 1973 version of Rule 52 encourages the possibility of an early review of assistant professors.

"Petitioner Leonard was notified of his non-reappointment on December 1, 1971. He appealed the decision to the San Diego Campus Committee on Privilege and Tenure where it was affirmed. Part of the reason for the non-reappointment was the fact that Indian History was being cut back on the San Diego campus, and Indian History happened to be Petitioner Leonard's specialty. At the time this decision was made, programatic changes were not specifically stated in Rule 52 and did not become a formal part of Rule 52 until 1973. The application of the proposed changes of Rule 52 were made to Petitioner Leonard while Petitioner Leonard's representative, the University Council, was attempting to meet and confer with the University.

"On November 9, 1970, Angus Taylor, Vice President of the University of California For Academic Affairs, issued a draft revision of Section 52 as a proposal.

"On February 5, 1971, Respondent received a letter addressed to President Hitch dated February 4, 1971 requesting a meeting to discuss the July 9, 1970 announcement of proposed changes in Rule 52. The November 9, 1970 proposed revision of Section 52 was distributed on that date only to the Chancellors of the various campuses of the University of California, and not to Employee Organizations such as Petitioner.

"On March 2, 1971, Vice President Taylor of the Respondent, as employee and agent of the Respondent, answered the request to meet and confer by stating that there was no need to meet in person and, instead, encouraging a telephone conversation. A meeting was arranged and did take place at the Davis campus on April 23, 1971 between representatives of the University Council and Vice President Taylor. The meeting of April 23, 1971 was terminated, and the Respondent University insisted that any further meetings be conducted on the campus level rather than on the University-wide level. Accordingly, meetings were held between the Local Unions affiliated with Petitioner University Council on the various campuses during May, June and July of 1971 concerning the first draft revision of Section 52, dated November 9, 1970.

"On October 5, 1971, Vice President Taylor distributed a second draft revision of Section 52, and sent a copy to the University Council. The University Council requested to meet and confer with University-wide representatives on October 18, 1971, but Vice President Taylor responded on October 18, 1971 that further meetings would take place on the campus level and a University-wide representative, such as Vice President Taylor, would be available to assist on the local campus meetings. On January 31, 1972, Vice President Taylor informed the University Council that he agreed to send a representative of his office to meetings on the campus level and indicated 'we shall not be in haste about issuing a final version of Section 52'. This followed the filing of this action numbered 419-502 in the Superior Court of the State of California, For the County of Alameda, alleging that the Respondents had failed to meet and confer in good faith. The hearing for the issuance of a Writ on the original Petition in this matter had been dropped from calendar.

"On September 15, 1972, the second draft revision of Rule 52 was withdrawn and a third version was issued on that date. Comments from the University Council and other groups had been taken into consideration in the drafting of the third version and Angus Taylor called for comments on the new version.

"On October 13, 1972, the University Council requested a University-wide meeting, but on October 23, 1972, the University responded by stating 'Campus meetings seem the most productive way of securing comment from your organization on proposed revisions to the manual. I will gladly cooperate in arranging to have the representative from my office at one or more of the campus meetings, if that is desired. I would like to judge the need for a University-wide meeting after a few campus meetings have been held.'

"Campus level meetings on the third draft revision took place at the San Diego, Irvine and Davis campuses of the University, and campus representatives were not authorized to alter, amend, modify, change, suspend or revoke Section 52 or authoritatively interpret the drafts, nor agree to any changes proposed by the University Council.

"On December 6, 1972, the University Council representatives met on the Berkeley Campus with Berkeley Provost George Maslach and J. Dean Swift, Academic Assistant to Vice President Angus Taylor.

"On February 1, 1973 the University Council, through its Executive Secretary Sam Bottone, wrote to find out the status of the third draft of Section 52 and when a fourth draft would be available for review. On February 5, 1973, Vice President Taylor transmitted to the Council the official revised and final version of Rule 52 and, in fact, the third draft revision of Rule 52, substantially intact, was implemented in final form. The University Council demanded that it be withdrawn in order that further meeting and conferring could take place on February 13, 1973 and again on April 13, 1973. However, on April 3, 1973, Angus Taylor had informed the University Council that any further meetings would be to discuss 'possible changes in Section 52' or 'improvements' indicating that Section 52 was implemented. On April 24, 1973, the University again refused to withdraw Section 52 and agreed to meet but without withdrawing Section 52."

These stipulated facts were incorporated in the findings of fact adopted by the trial court. The court also found that at the December 6, 1972, meeting Vice-Presidential Academic Assistant Swift stated that the third draft revision of section 52 was being withdrawn to be rewritten. The following, however, are the findings that appellants now specifically seek to attack: "20. The representatives of the parties hereto met and conferred on numerous occasions over a two-year period concerning the modification of Section 52 of Respondents' Academic Personnel Manual. Petitioners made recommendations with respect to the modification of Section 52 which were incorporated in the Section ultimately adopted. [¶] 21. Respondents met and conferred in good faith with Petitioners at all times, including but not limited to the meeting of December 6, 1972."[3]

B. *Analysis of the law applicable thereto.*

Section 3530 was part of new chapter 10.5 which was added to the Government Code by Statutes 1971, chapter 254, section 6, page 403. This chapter (§ 3525 et seq.) is entitled "State Employee Organizations." Understandably therefore, there has not yet been a case in which the courts have been called upon to interpret section 3530.

We look for guidance therefore to the companion chapter dealing with local public employee organizations enacted in 1961. (Gov. Code, § 3500

---

[3]As a conclusion of law therefrom, the court stated: "Respondents fully complied with such legal obligations as they might have had to meet and confer with Petitioners concerning the modification and reissuance of Section 52 as revised in February of 1973."

et seq.) There, the analogous statute is section 3505. This section, as recently amended, now includes a definition of the phrase "meet and confer in good faith." In its present form, this section reads: "The governing body of a public agency, or such boards, commissions, administrative officers or other representatives as may be properly designated by law or by such governing body, shall meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of such recognized employee organizations, as defined in subdivision (b) of Section 3501, and shall consider fully such presentations as are made by the employee organization on behalf of its members prior to arriving at a determination of policy or course of action. [¶] 'Meet and confer in good faith' means that a public agency, or such representatives as it may designate, and representatives of recognized employee organizations, shall have the mutual obligation personally to meet and confer promptly upon request by either party and continue for a reasonable period of time in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement on matters within the scope of representation prior to the adoption by the public agency of its final budget for the ensuing year. The process should include adequate time for the resolution of impasses where specific procedures for such resolution are contained in local rule, regulation, or ordinance, or when such procedures are utilized by mutual consent."

The Winton Act (Stats. 1965, ch. 2041, § 2) as amended, includes a similar legislative definition of the term "meet and confer." Education Code section 13085 requires public school employers to "meet and confer" with representatives of employee organizations. What this means is explained as follows in Education Code section 13081, subdivision (d): " 'Meet and confer' means that a public school employer, or such representatives as it may designate, and representatives of employee organizations shall have the mutual obligation to exchange freely information, opinions, and proposals; and to make and consider recommendations under orderly procedures in a conscientious effort to reach agreement by written resolution, regulation, or policy of the governing board effectuating such recommendations." And this duty to negotiate refers, of course, only to the necessity of meeting and conferring in good faith. Neither side is under any compulsion to agree as to any matters in dispute under our state statutes. (*Los Angeles County Employees Assn., Local 660* v. *County of Los Angeles* (1973) 33 Cal.App.3d 1, 4, fn. 3 [108 Cal.Rptr. 625], citing *East Bay Mun.*

*Employees Union* v. *County of Alameda* (1970) 3 Cal.App.3d 578, 584 [83 Cal.Rptr. 503].)

The concept of industrial collective bargaining does not, of course, apply to public employees in California. (*Sacramento County Employees Organization, Local 22 etc. Union* v. *County of Sacramento* (1972) 28 Cal.App.3d 424 [104 Cal.Rptr. 619]. But under the Meyers-Milias-Brown Act of 1968, a "public employer must 'meet and confer in good faith regarding wages, hours and other terms and conditions of employment with representatives of . . . recognized employee organizations, . . .' " (*Id.,* at p. 429.)

Respondent treats the federal authorities cited and discussed in appellants' brief somewhat cavalierly, merely suggesting that they are not in point and should be ignored. We do not agree. California courts "have often looked to federal law for guidance in interpreting state provisions whose language parallels that of the federal statutes." (*Social Workers' Union, Local 535* v. *Alameda County Welfare Dept.* (1974) 11 Cal.3d 382, 391 [113 Cal.Rptr. 461, 521 P.2d 453]; accord, *Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608, 616 [116 Cal.Rptr. 507, 526 P.2d 971].)

Under the Labor-Management Relations Act (29 U.S.C. § 141 et seq.), it is an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees. (29 U.S.C. § 158, subd. (a)(5).)

"To bargain collectively" is defined as "the performance of the mutual obligation of the employer and the representative of the employees *to meet* at reasonable times *and confer in good faith* with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, . . ." (29 U.S.C. § 158, subd. (d), italics added.)

Our courts have recognized that sections 3504 and 3505 of the Government Code borrow language from the above federal code section. (See *Fire Fighters Union* v. *City of Vallejo, supra,* 12 Cal.3d 608 at p. 615; *Dublin Professional Firefighters, Local 1885* v. *Valley Community Services Dist.* (1975) 45 Cal.App.3d 116, 119 [119 Cal.Rptr. 182]; see also Grodin, *Public Employee Bargaining in California: The Meyers-Milias-Brown Act in the Courts* (1972) 23 Hastings L.J. 719, 749.)

■ Despite the fact that in California public employees do not have the same right to bargain collectively as do workers in private industry, or as the term is used in the federal Labor-Management Relations Act, since the federal statute includes language similar to that found in both Government Code sections 3505 and 3530, it is appropriate for this court to look to relevant federal authorities for further guidance in determining what is meant by the term "to meet and confer in good faith."

In *Labor Board* v. *Katz* (1962) 369 U.S. 736, 743 [8 L.Ed.2d 230, 236, 82 S.Ct. 1107], an authority upon which appellants rely heavily, the Supreme Court found that the duty to meet and confer in good faith with respect to wages, hours, and other terms and conditions of employment "may be violated without a general failure of subjective good faith; . . ." It held that "an employer's unilateral change in conditions of employment under negotiation is . . . a violation of § 8(a)(5) [29 U.S.C. § 158, subd. (a)(5)], for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal." (Accord, *Continental Insurance Company* v. *N. L. R. B.* (2d Cir. 1974) 495 F.2d 44, 48.)

*Katz,* however, draws a distinction between those cases in which the unilateral action of the employer can be construed as disparaging or undermining the union and those in which the action cannot be so construed. (*Labor Board* v. *Katz, supra,* 369 U.S. 736 at p. 745, fn. 12 [8 L.Ed.2d at p. 237].)[4] Thus, although it is an unfair practice for an employer to grant wage increases greater than any he has ever offered the union at the bargaining table for the reason that such action is necessarily inconsistent with a sincere desire to conclude an agreement with the union, it is not necessarily an unfair practice for an employer, after notice and consultation, to "unilaterally" institute a wage increase identical with one which the union has rejected as too low. (*Id.*)

■ It appears that the instant case falls within the latter type of case, distinguished in *Katz*. Here the final form of section 52 was substantially the third draft revision of section 52. Comments from appellant the University Council and other groups had been taken into consideration in the drafting of the third draft revision and further comments were

---

[4]Footnote 12 states: "Of course, there is no resemblance between this situation and one wherein an employer, after notice and consultation, 'unilaterally' institutes a wage increase identical with one which the union has rejected as too low. See *Labor Board* v. *Bradley Washfountain Co.,* 192 F.2d 144, 150-152; *Labor Board* v. *Landis Tool Co.,* 193 F.2d 279."

requested by respondent. Campus level meetings were held on the third revision, which revision Vice-Presidential Academic Assistant Swift stated on December 6, 1972, was being withdrawn to be rewritten. It was this third draft, reflecting the comments of the University Council as well as other groups, which was implemented in final form "substantially intact." It is not this type of "unilateral" action which is condemned in *Katz*. Therefore, we cannot say as a matter of law that the action of respondent in adopting the revised section 52 was an action which is a per se violation of respondent's obligation to meet and confer in good faith.

C. *Was there substantial evidence to support the trial court's finding that the Regents met and conferred with the University Council in good faith?*

The question of good or bad faith on the part of the union or employer is primarily a factual one. (*N. L. R. B.* v. *Reisman Bros., Inc.* (2d Cir. 1968) 401 F.2d 770, 771.) Resolution of the question of good faith necessarily involves consideration of all the facts of a particular case. (*N. L. R. B.* v. *Newberry Equipment Company* (8th Cir. 1968) 401 F.2d 604, 606.) In the instant case the court found that respondent at all times met and conferred in good faith. Where there is substantial evidence to support a finding of the trial court, the appellate court will uphold the trial court's finding. (*Overton* v. *Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757].)

"Whether a party is chargeable with an overall failure to bargain in good faith 'involves a finding of motive or state of mind,' which must be inferred from the evidence viewed as a whole." (*N. L. R. B.* v. *Columbia Tribune Publishing Company* (8th Cir. 1974) 495 F.2d 1384, 1391.) The duty to confer in good faith does not compel either side to make concessions or to yield any positions fairly maintained, but it does require the parties to bargain with an open mind and sincere intention to reach an agreement. (*Id.*)

Government Code section 3505 defines "meet and confer in good faith" to mean "that a public agency, or such representatives as it may designate, and representatives of recognized employee organizations, shall have the mutual obligation personally to meet and confer promptly upon request by either party and continue for a reasonable period of time in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement on matters within the scope of representation. . . ."

 We cannot say in this instance that there is a lack of sufficient substantial evidence in the record to support the trial court's finding that respondent met its obligation to meet and confer in good faith with appellant University Council.

On November 9, 1970, Angus Taylor, Vice-President of the University of California for academic affairs, issued a draft revision of section 52 as a proposal. A meeting was arranged and did take place at the Davis campus on April 23, 1971, between representatives of the University Council and Vice-President Taylor. Further meetings were held between the local unions affiliated with the University Council on the various campuses during May, June and July of 1971 concerning the first draft revision of section 52.

On October 5, 1971, Vice-President Taylor distributed a second draft revision of section 52 and sent a copy to the University Council. On January 31, 1972, Taylor informed the University Council that he agreed to send a representative of his office to meetings on the campus level.

On September 15, 1972, the second draft revision of section 52 was withdrawn and a third version was issued on that date. Comments from the University Council and other groups had been taken into consideration in the drafting of the third version and Taylor called for comments on the new version. Campus level meetings on the third draft revision took place at the San Diego, Irvine and Davis campuses of the university.

On December 6, 1972, the University Council representatives met on the Berkeley campus with Berkeley Provost George Maslach and J. Dean Swift, Academic Assistant to Vice-President Angus Taylor. This meeting was characterized as a university-level meeting.

Appellant University Council did not make any proposals, suggestions, or proposed amendments to section 52 at that meeting. Although the University Council had drafted a detailed set of recommendations, these were not submitted to respondent. In *N. L. R. B.* v. *Alva Allen Industries, Inc.* (8th Cir. 1966) 369 F.2d 310, 321, the court stated, "The negotiations of the Company must be measured in the light of surrounding circumstances, which include corresponding attempts at good faith negotiation by the Union." Both Government Code section 3505 and Education Code section 13081, subdivision (d), speak in terms of the "*mutual* obligation" to meet and confer in order "to exchange freely information, opinions, and proposals."

There is some insinuation from the facts stated in appellants' brief that the Regents may have acted precipitously to frustrate an opportunity to discuss the proposed changes in section 52 at an All University Faculty Conference scheduled to be held in the latter part of March 1973. If true, this would indeed amount to a serious breach of good faith. But even if it might be said that there was some testimony in this case tending to support this conclusion, this would only give rise to a triable issue of fact which the trial judge who heard the evidence has resolved in favor of the respondent.

We therefore conclude that the trial court's finding that respondent acted in good faith is supported by substantial evidence, and cannot be disturbed.

### Is the Question as to Whether the Changes in Section 52 Have Been Retroactively Applied to Petitioners Lipow and Leonard an Issue That Is Properly Before the Court?

Appellants state in their brief: "Lipow and Leonard were added as Petitioners in this case to show two separate ways in which Assistant Professors were affected by the changes which were made in Section 52." After thus explaining that the individual petitioners were made added parties merely for exemplary reasons, they thereafter somewhat inconsistently endeavor to raise an issue involving petitioners Lipow and Leonard alone; namely, that even if the changes in section 52 had been made in good faith, they were nevertheless applied retroactively to these petitioners so as to adversely affect the status of each of them under the preexisting rules.

While respondent's brief ignored this point, it later appeared from a letter brief that was subsequently filed with the permission of this court[5] that the failure to comment on this point was intentional. This was for reasons that were then made both clear and understandable.

First, the supposed retroactive application of section 52 was not one of the stipulated issues at the trial, and is therefore one that appellants have improperly endeavored to inject into this case for the first time on appeal. (*Estate of Cooper* (1970) 11 Cal.App.3d 1114, 1123 [90 Cal.Rptr.

---

[5]We had the clerk of this court call this omission to the attention of counsel for respondent on the theory that the point may have been inadvertently overlooked.

283].) The factual and legal contentions made by each of the parties were set forth in the joint pretrial statement of counsel adopted as the trial court's pretrial order made and filed pursuant to rules 214 and 216 of the California Rules of Court. There, the issues in the case were thus stated: "The issues to be determined concern whether or not the University has met and conferred in good faith and whether there is an obligation upon the University to do so. The scope of the remedy is also in issue, since Petitioners ask that Leonard be returned to his position and that he and Lipow be evaluated currently on standards as they existed as of July 9, 1970, until the University has satisfied any obligation it may have to meet and confer in good faith."

Moreover, the record is replete with instances in which counsel for appellants clearly waived any issue unrelated to the "meet and confer" issue. We single out, for example, the following statement of counsel: "Lipow and Leonard are in the case because they are exemplary. Mr. Lipow, should he be unsuccessful in obtaining tenure during this current review,[6] could still bring his action. We have not sought to litigate the merits of Mr. Lipow's case in this case."[7]

Furthermore, as pointed out in respondent's letter brief, there was no evidence to support any theory based upon retroactive application of the revised rule.

"The pretrial order determines the issues to be tried; issues that are not designated as being in dispute are no longer issues in the case [citations]. Until a request for modification is made, the trial judge and the parties have a right to rely on the posture of the case as defined by the pretrial order." (*Estate of Cooper, supra,* 11 Cal.App.3d 1114 at p. 1122.)

---

[6]It elsewhere appears that administrative proceedings involving Mr. Lipow's status were actually pending at the time of the trial below.

[7]As to Leonard, after his counsel conceded that the university had the right to eliminate the course that he had been teaching, the following colloquy occurred between court and counsel: "THE COURT: You mean you infer from this he should have a certain preference with respect to other opportunities? MR. WEINBERG: Yes, Your Honor. THE COURT: That may be available, in which he would be, say, average qualified, at least? MR. WEINBERG: Right. We don't want the Court to decide that question. What we want the Court to decide is whether or not we should have been given an adequate or reasonable opportunity to meet and confer on what you do with an individual in that case, whether that individual has, not just campus tenure, but University-wide tenure, something that is also in the works and has never been determined, really—and this Court can't determine that—whether Professor Leonard—we want to meet and confer about Professor Leonard going to some other campus to teach Indian History, or staying at San Diego and teaching in some other area."

This disposes of the matter, and we decline to consider whether or not there is any merit to the point in question.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied January 6, 1976.