[Civ. No. 47538. First Dist., Div. Two. Sept. 25, 1979.]

SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT,
Petitioner, v.
THE SUPERIOR COURT OF CONTRA COSTA COUNTY,
Respondent;
UNITED PUBLIC EMPLOYEES, LOCAL 390, SERVICE
EMPLOYEES INTERNATIONAL UNION, AFL-CIO,
Real Party in Interest.

154

**COUNSEL**

Malcolm Barrett, Thomas Jackson and John R. Vickland for Petitioner.

No appearance for Respondent.

Van Bourg, Allen, Weinberg & Roger, Stewart Weinberg, Victor J. Van Bourg and David A. Rosenfeld for Real Party in Interest.

**OPINION**

**TAYLOR, P. J.**—In this extraordinary writ proceeding stemming from a labor dispute, petitioner, San Francisco Bay Area Rapid Transit District (hereafter BART), petitions this court for a writ of mandate to compel respondent superior court to vacate portions of its order of August 3, 1979, which BART contends have exceeded the jurisdiction of respondent court. The order was entered as a consequence of a mandate proceeding initiated in respondent court by real party in interest, United Public Employees, Local 390, Service Employees International Union, AFL-CIO, an unincorporated association (hereafter Union), wherein Union sought to compel BART (1) to negotiate in good faith with Union by agreeing to submit to final and binding arbitration all outstanding issues in the current collective bargaining process or, in the alternative, to submit to formal mediation of existing issues; (2) to set aside the transfers of 80 employees and to refrain from transferring said employees unless said employees were given an opportunity to respond to charges; and (3)

to prohibit BART from using managerial or supervisory personnel to perform bargaining unit work performed by the supplanted Union members.

■ Although the order contains six provisions, BART in this proceeding seeks relief from only two of its provisions, contending that paragraphs 4 and 6 of the order have unlawfully prevented it from exercising its discretion in the matters of assignment, transfer and discipline of its employees, and that the effect of those portions of the order is to impair BART's ability to operate a safe and efficient rapid transit system.[1] We have concluded that BART is entitled to the relief requested.[2]

The order made by respondent court on August 3, 1979, compels BART and the Union forthwith to resume negotiations in good faith for a written contract governing wages, salaries, hours, working conditions and grievance procedures (par. 1); compels Union and its agents and persons acting in concert with it to cease and desist forthwith from occupying BART's Concord shop facility (par. 2); compels Union and its agents and persons acting in concert with it to cease and desist from any slowdown forthwith (par. 3); compels BART to rescind massive transfers of personnel as outlined in its letter of July 27, 1979, and to cease and desist from transfers without cause (par. 4); requires the parties to return to respondent court on September 11, 1979, for further proceedings (par. 5); and stays the imposition of any discipline by BART upon Union members who occupied the building at the Concord yard pending the outcome of arbitration proceedings (par. 6).

The labor dispute from which this proceeding arises is set against a backdrop that affects in some degree a vast number of inhabitants of the San Francisco Bay Area. This court shall first set forth some observations relating to the importance of mass rapid transit service to the welfare of the citizens of the bay area and to the people of this state and to the magnitude of the harm which will necessarily flow from any disruption of BART services.

[1] Union did not seek review of those portions of the order compelling it and its agents and persons acting in concert with it to cease and desist forthwith from occupying the BART Concord shop facility (par. 2), and to cease and desist from any slowdown forthwith (par. 3).

[2] By directing the issuance of an alternative writ of mandate to be heard before this court, we necessarily determined that there is no adequate remedy in the ordinary course of law and that this case is a proper one for the exercise of original jurisdiction (5 Witkin, Cal. Procedure (2d ed. 1971) § 94, p. 3870).

BART is a rapid transit district formed pursuant to the "San Francisco Bay Area Rapid Transit District Act" (Pub. Util. Code, § 28500).[3] The district was created in furtherance of the declared policy of the state to stimulate the maximum use of the harbor in San Francisco Bay, one of the finest harbors in the world, in order to foster and develop international and other trade for the benefit of the entire state. The Legislature determined that the harbor could be fully utilized only by a system of rapid and effective transportation between the various portions of the metropolitan areas surrounding the bay and that only a specially created district could freely operate in the 84 individual units of county, city and county, and city governments located in this area. The Legislature, in creating the district, was convinced that the prosperity of the entire bay area would depend upon the preservation and enhancement of its urban centers and subcenters; and that sustaining these centers and subcenters as concentrations of employment, commerce and culture, in turn, would depend upon providing an adequate, modern, interurban mass transit system (§ 28501).

The government of the district is vested in a board of directors (§ 28745). The board of directors is the legislative body of the district, vested with the authority to determine all questions of district policy (§ 28762) and to do all things necessary to carry out the purposes of the act (§ 28763).

The act also contains provisions relating to the representation of employees by a labor organization (§ 28850 et seq.). Section 28850 provides that "the board, upon determining as provided in Section 28851 that said labor organization represents the employees in the appropriate unit, and the accredited representative shall bargain in good faith and make all reasonable efforts to reach agreement on the terms of a written contract governing wages, salaries, hours, working conditions and grievance procedures." Union is a labor organization certified to represent or act for employees in a collective bargaining unit, as provided in sections 28850 and 28851.

The following facts are gleaned from the pleadings filed in respondent court and in this court:

BART and Union are parties to a collective bargaining agreement, negotiated pursuant to section 28850, which expired by its terms on June

---

[3]Unless otherwise indicated, all future references will be made to the Public Utilities Code.

30, 1979. Beginning July 1, 1979, BART agreed to extend the previous collective bargaining agreement and its terms on a day-to-day basis. On July 7, 1979, BART made an offer to the Union which included a revised cost of living adjustment provision and designated that proposal as its "final offer." On July 8, 1979, Union offered to submit the final positions of both parties to final and binding arbitration, which offer BART refused. On July 8, 1979, allegedly because of a deterioration in transit service, BART concluded it could no longer manage the district on the basis of the old agreement, and on that date BART informed the Union that the old agreement would not be extended beyond July 11, 1979.

On July 18, 1979, BART's car count, which had stood at 360 prior to the commencement of negotiations, had been reduced to 170. This lack of availability was allegedly the result of a slowdown by maintenance workers represented by the Union. On July 27, 1979, by letter to Union's executive secretary, BART advised Union that a temporary emergency existed until such time as total car availability was returned to the required level of at least 310 cars to provide acceptable service, and that effective Monday, July 30, 1979, most members of the Union presently working at the Concord maintenance shop would be temporarily assigned to the Hayward and Richmond shops. The letter stated, in pertinent part: "Effective on the same date [July 30, 1979] during this emergency, we will assign engineering and management personnel to the Concord Shop to perform the necessary maintenance and inspection work to accelerate solution of the car availability problem." The letter concludes: "During this temporary emergency, the District will not be guided by any provisions of the old agreement which might otherwise be in conflict with the above-listed actions and they are not in effect for this purpose."

BART alleges that shortly after midnight on July 30, 1979, Paul Varacalli, executive secretary of United Public Employees Local 390, John Maher, its chapter chairperson, Jim Danzy, president of the Amalgamated Transit Union, Division 1555, and some 50 members of Local 390 employed by BART, entered BART's maintenance and repair shop in Concord, forcibly evicted two of BART's supervisors, locked themselves in, and took possession of the building.[4]

On July 30, 1979, the same day BART was dispossessed of its facilities, the Union filed its petition for writ of mandate in respondent court. In the

---

[4] They remained in possession until August 3, 1979, despite repeated requests by BART to leave. August 3, 1979, was the date of the court's order.

first cause of action, the Union contended that BART had failed to negotiate in good faith, had refused to submit the dispute to arbitration or mediation and had disciplined employees "without grievance procedure rights or proper pre-disciplinary rights as provided by the due process clauses of the United States and California Constitutions. . . ."

In the second cause of action, the Union alleges that the transfer of maintenance employees from the Concord yard was a disciplinary action retaliating against employees for allegedly "slowing down" and failing to maintain cars, that the transfers inconvenienced the employees, and that the action was taken "without a statement of charges, without a notice indicating to employees the evidence underlying the reasons for the transfer, and without giving the employees the opportunity to respond in advance of the disciplinary action having been taken."

In the third cause of action, the Union alleged that a decision to remove bargaining unit work from employees and to place "non-covered" or "exempt" employees in bargaining unit work without meeting and conferring in good faith was a "violation of rights guaranteed under the Public Utilities Code."

On July 30, 1979, an alternative writ of mandate issued along with an order shortening time, the matter to be heard before respondent court on August 2, 1979.

On August 2, 1979, BART demurred to the petition for mandate and also submitted its answer. In the demurrer, BART contended that the petition did not state facts sufficient to constitute a cause of action for issuance of a writ of mandate in that the actions sought to be compelled were not required by statute and were within the discretion of BART. The occupation by the Union members of the Concord shop, a fact not contained in the Union's petition for mandate, was disclosed in BART's pleadings.

Following argument in chambers and on the record of August 2 and 3, 1979, respondent court, pending ruling on the demurrer, entered its "interim" order of August 3.

On August 8, 1979, after having been denied a stay by respondent court, BART filed its petition for mandate in this court.

On August 23, 1979, upon receipt of opposition from the Union, this court issued an alternative writ of mandate commanding respondent court to vacate paragraphs 4 and 6 of its order, or in the alternative, to show cause before this division on Tuesday, September 11, 1979, why it had not done so.

BART does not contest that portion of the order compelling it to negotiate in good faith with the Union. Section 28850 provides that the board "and the accredited representative [of the Union] *shall* bargain in good faith and make all reasonable efforts to reach agreement on the terms of a written contract governing *wages, salaries, hours, working conditions and grievance procedures*" (italics added). Section 14 provides that "shall" is mandatory and "may" is permissive. The board's statutory duty to bargain in good faith is *mandatory* and may be compelled by mandate (Code Civ. Proc., § 1085).

It is clear from the prayer of the Union's complaint, however, that the Union was attempting to obtain from respondent court relief not available to it by mandate. The Union sought to compel BART to negotiate in good faith "by agreeing to submit to final and binding arbitration . . . or, in the alternative, submit to formal mediation of existing issues through the offices of the Conciliation Service of the State of California." Section 28850 provides, with respect to arbitration, that "In case of a dispute over the terms of a written contract governing *wages, salaries, hours or working conditions,* which is not resolved by negotiations in good faith between the board and the representatives of the employees, *upon the agreement of both,* the board and the representatives of the employees *may* submit said dispute to the decision of the majority of an arbitration board, and the decision of the majority of such arbitration board shall be final" (italics added). The arbitration provision is *permissive,* not mandatory. Mandate will not lie to control discretion lawfully entrusted to the board (*State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 247 [115 Cal.Rptr. 497, 524 P.2d 1281]; *City & County of S. F.* v. *Superior Court* (1959) 53 Cal.2d 236, 244 [1 Cal.Rptr. 158, 347 P.2d 294]).

BART contends that its statutory duty to bargain in good faith (§ 28850) does not provide authority for paragraphs 4 or 6 of respondent court's order restraining BART in the transfer and discipline of its employees.

The Union concedes that there are no reported cases interpreting the obligation to bargain contained in section 28850. The Union seeks to argue, by reference to federal law, that BART was bound by its obligation to bargain in good faith and to apply the federal principle that an employer will not change conditions while bargaining in good faith continues.

In support of this argument, the Union cites *Labor Board* v. *Katz* (1962) 369 U.S. 736 [8 L.Ed.2d 230, 82 S.Ct. 1107], but see *Lipow* v. *Regents of University of California* (1975) 54 Cal.App.3d 215, 226 [126 Cal.Rptr. 515], which notes that Katz draws a distinction between those cases in which the unilateral action of the employer can be construed as disparaging or undermining the Union and those in which the action cannot be so construed.

BART denies that it has failed to negotiate in good faith and that its intended transfer of the 80 employees was a disciplinary action, contending that the reasons for the transfer were set forth in its letter of July 27, 1979. It is apparent from BART's letter that BART management considered the greatly reduced car count an emergency and that the transfers were necessary "to accelerate solution of the car availability problem."

In any event, federal precedents are not binding on this court (*People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129]).[5] As a political subdivision of the State of California, the BART district is excluded from the definition of "employer" for the purposes of the National Labor Relations Act (29 U.S.C. § 152(2)).[6]

Moreover, slowdowns and seizures of the employer's plant are not protected activities under federal law. ". . . deliberate 'slowdowns' and

[5]Although federal precedents are not binding on this court, federal precedents have often been invoked by the California courts in construing the Meyers-Milias-Brown Act (*Crowley* v. *City and County of San Francisco* (1976) 64 Cal.App.3d 450, 458, fn. 1 [134 Cal.Rptr. 533]). But the "meet and confer" provisions of Government Code section 3505 do not apply to BART, which has its own statutorily prescribed method of administering employer-employee relations (see Gov. Code, § 3500).

[6]Section 152 provides, in part: "When used in this subchapter—(2) The term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, *or any State or political subdivision thereof,* or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization." (Italics added.)

'walkouts' by the employees to exert pressure on the employer to accept the union's bargaining demands [are] unprotected concerted activities, and the employer [is] free to discharge the participating employees for their unlawful disloyal tactics" (*N. L. R. B.* v. *Blades Manufacturing Corporation* (8th Cir. 1965) 344 F.2d 998, 1005).

Other decisions of the National Labor Relations Board are in accord. In *Phelps Dodge Copper Products Corporation and Local No. 441, International Union of Electrical, Radio & Machine Workers* (1952) 101 N.L.R.B. 360, 368, the board observed: "It is well established that a slowdown is a form of concerted activity unprotected by the Act [citation]. The vice of the slowdown derives in part from the attempted dictation by employees, through this conduct, of their own terms of employment. They are accepting compensation from their employer without giving him a regular return of work done." And it was stated in *Elk Lumber Co. and Lumber and Sawmill Workers Union, Local 3063, AFL* (1950) 91 N.L.R.B. 333, 337: " 'We are aware of no law or logic that gives the employee the right to work upon terms prescribed solely by him. That is plainly what was sought to be done in this instance. It is not a situation in which employees ceased work in protest against conditions imposed by the employer, but one in which the employees sought and intended to work upon their own notion of the terms which should prevail. If they had a right to fix the hours of their employment, it would follow that a similar right existed by which they could prescribe all conditions and regulations affecting their employment.' "

The record establishes that BART's intended transfer of employees purportedly engaged in the slowdown was followed by the "sit-in" by Union members at the Concord facility. The Union does not deny that the sit-in occurred, but argued at the hearing on the order to show cause issued by this court that BART's "bad faith" was the provocation which led to the sit-in. Under federal law, the existence of a labor dispute or an unfair labor practice does not justify the seizure of the employer's plant. In a case in which 95 employees took over and occupied 2 of the employer's key buildings, causing work to stop and the remainder of the plant to cease operations, the United States Supreme Court in *Labor Board* v. *Fansteel Corp.* (1939) 306 U.S. 240, 252 [83 L.Ed. 627, 634, 59 S.Ct. 490, 123 A.L.R. 599], denounced the seizure and retention of the employer's property as a "high handed proceeding without shadow of legal right," holding as follows, at pages 253-254 [83 L.Ed. at p. 634]: "The employees had . . . no license to commit acts of violence or to seize

their employer's plant. We may put on one side the contested questions as to the circumstances and extent of injury to the plant and its contents in the efforts of the men to resist eviction. The seizure and holding of the buildings was itself a wrong apart from acts of sabotage. But in its legal aspect the ousting of the owner from lawful possession is not essentially different from an assault upon the officers of an employing company, or the seizure and conversion of its goods, or the despoiling of its property or other unlawful acts in order to force compliance with demands. *To justify such conduct because of the existence of a labor dispute or of an unfair labor practice would be to put a premium on resort to force instead of legal remedies and to subvert the principles of law and order which lie at the foundations of society.*

"As respondent's unfair labor practices afforded no excuse for the seizure and holding of its buildings, respondent had its normal rights of redress. Those rights, in their most obvious scope, included the right to discharge the wrongdoers from its employ" (italics added).

It is apparent that under federal law, Union members could have been subject to *discharge* for engaging in either a slowdown or the seizure of the BART Concord facility, yet BART's resort to the less drastic measures of *transfers* to cope with the slowdown and its attempt to *discipline* employees who refused transfers and seized the Concord shop has been restrained by respondent court.[7] We find no support in either statutory or case authority for paragraphs 4 and 6 of respondent court's order.

The Union argues further that BART was bound by its obligation to bargain in good faith to honor the terms of the expired contract while bargaining continued. As we have seen, the contract expired by its terms on June 30, 1979, was extended on a day-to-day basis for a short period and on July 11, 1979, was terminated by BART. In the absence of any agreement to the contrary, BART employees serve *at the pleasure* of the general manager (§ 28811), who has authority with certain limitations to

---

[7]The Union, at the time the order issued, remained in possession of and was occupying BART's Concord facility, preventing the accomplishment of any work at this location. In this volatile situation, respondent court felt constrained to take action to "stay any chaos and perhaps prevent disorder." As BART points out, however, if BART employees (and public employees in general) are permitted to conclude that forceful seizure of public property will result in the attainment of better rights and a superior bargaining position, such activity will be encouraged. It is not the intent of the Legislature nor is it the intent of this court to condone such unlawful conduct (see Code Civ. Proc., § 527.3, subd. (e); *City of L. A.* v. *Los Angeles etc. Council* (1949) 94 Cal.App.2d 36, 41 [210 P.2d 305]).

"appoint, discipline or remove all officers and employees subject to the rules and regulations adopted by the board·. . . ." (§ 28834, subd. (d).)[8]

It was not until July 27, 1979, after the termination of the collective bargaining agreement, that BART notified the Union of its intent to transfer the 80 employees, advising the Union that it would not for that purpose be bound by the terms of the old agreement. ■ It is well settled in California that a public employee *serving at the pleasure* of the appointing authority may be terminated without cause and without notice of hearing (*Bogacki* v. *Board of Supervisors* (1971) 5 Cal.3d 771, 783 [97 Cal.Rptr. 657, 489 P.2d 537]). Cases holding that employees who have vested rights in employment positions are entitled to notice and opportunity to be heard prior to termination (*Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774]) and a later case extending those rights to employees who are being disciplined by short term suspensions (*Civil Service Assn.* v. *City and County of San Francisco* (1978) 22 Cal.3d 552 [150 Cal.Rptr. 129, 586 P.2d 162]) are not applicable under the circumstances shown here.

■ Assuming, without conceding, that BART was bound by its duty to bargain in good faith to honor the terms of the expired contract while the bargaining process continued, respondent court's order has imposed upon BART terms which were not included in the old agreement. Although the document is not before us, we assume from arguments made by the parties that the now expired contract contained provisions for the arbitration of grievances; we are not directed to any provision of the contract which prohibits BART from transferring its employees, and it is unlikely that a collective bargaining agreement would contain such a provision. BART argues, and the Union does not effectively refute the argument, that under the terms of the expired agreement, BART in "extreme cases" could impose *immediate* discipline; respondent court has stayed the imposition of discipline pending arbitration and has prevented the immediate imposition of discipline on employees who have been

---

[8]Section 28811 provides: "The secretary, general manager, general counsel, treasurer, and controller shall be appointed by and may be removed by the affirmative votes of a majority of the members of the board of directors. *All other officers and employees shall be appointed by the general manager and shall serve at his pleasure, subject to the provisions of this part relating to personnel*" (italics added).

Section 28834 provides: "The powers and duties of the general manager are . . . (d) To administer the personnel system adopted by the board and except for officers appointed by the board to appoint, *discipline or remove all officers and employees subject to the rules and regulations adopted by the board* and the applicable provisions of this part" (italics added).

insubordinate in refusing transfers, and who have engaged in unlawful conduct in taking possession of the Concord shop.[9]

In summary, this court finds no support for paragraphs 4 and 6 of the order interfering with BART's discretion in transferring and disciplining its employees in case law, statute, contract or otherwise.

Let a peremptory writ of mandate issue as prayed.

Rouse, J., and Miller, J., concurred.

The petition of real party in interest for a hearing by the Supreme Court was denied November 21, 1979. Bird, C. J., was of the opinion that the petition should be granted.

---

[9]It appears that grievance procedures are among the unresolved issues in the present collective bargaining process. Although grievance procedures are included in the statutory provisions for good faith negotiation, grievance procedures are omitted from the statutory provisions for arbitration (§ 28850).